In re Dennis E. CARLSON, Debtor.

William A. Brandt, Jr., Trustee, Plaintiff,

v.

Dennis E. Carlson, Defendant.

William A. Brandt, Jr., Trustee, Plaintiff,

v.

William E. Hourigan, Defendant.

William A. Brandt, Jr., Trustee, Plaintiff,

v.

Loraine Carlson, Defendant.

Bankruptcy No. 96 B 09606.
Adversary Nos. 97 A 01153,
97 A00967, 97 A00850.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

March 10, 1999.

Steven S. Potts, Law Offices of Andrew J. Maxwell, Chicago, IL, for Plaintiff.

William E. Hourigan, William A. Brandt, Jr., Trustee, Chicago, IL, for Respondent or Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

The three subject Adversary actions all relate to the case of debtor Dennis Carlson ("Carlson" or "Debtor"), now pending under Bankruptcy Code Chapter 7. Chapter 7 Trustee William A. Brandt, Jr. ("Trustee" or "Brandt") filed these three cases, which were consolidated for trial.

Adversary Number 97 A 00967 lies against the Debtor and seeks to bar his discharge under § 727(a)(2)(B) of the Code, Title 11 U.S.C. § 101, *et seq.*, because of asserted concealment of estate property (Count I), under § 727(a)(3) for asserted failure to keep records (Count II), and asserted false oaths under § 727(a)(4)(A) (Count III). Adversary Number 97 A. 00850 lies against William Hourigan ("Hourigan"), a lawyer and friend of the Debtor, and seeks under § 542(a) to recover asserted property of the bankruptcy estate that debtor caused to be transferred to him. The third case, Adversary Number 97 A 01153, lies against Debtor's former spouse Loraine ("Loraine"). It seeks under § 542(a) an accounting for and turnover of money paid to her (Count I), to avoid certain payments to her asserted to be preferential under 11 U.S.C. § 547 (Count II), and to avoid certain post-bankruptcy payments to her under § 549 (Count III).

Following consolidated trial of the three cases, final argument was taken in writing. The Trustee then moved against Loraine and Hourigan to conform pleadings to the proofs. Those motions were denied because he thereby sought following trial to assert new theories against Defendants Loraine and Hourigan under Bankruptcy Code §§ 548(a) and 550(a) which were not pleaded against them, and also under § 549(a) against Hourigan which was not pleaded in the Complaint against him.

The Court now makes and enters the following Findings of Fact and Conclusions of Law which will be filed and entered separately in each of the three cases. Pursuant thereto, the following judgments will be entered in these cases:

#### 97 A 00967—Brandt v. Carlson

Judgment will enter for Plaintiff on each Count of the Complaint.

#### 97 A 00850—Brandt v. Hourigan

Judgment will enter for Plaintiff in the amount of $4,510.

#### 97 A 01153—Brandt v. Loraine Carlson

Judgment will enter for Plaintiff on Count I for all monies she received from Carlson's fees endorsed over to her after such conversion date. Judgment will enter for Defendant on Count II. Judgment will enter for Plaintiff on Count III in an amount totaling the amount of Carlson fees endorsed over to her after conversion to Chapter 7.

### FINDINGS OF FACT

1. Dennis E. Carlson ("Debtor") is Debtor in the underlying bankruptcy case. He is an attorney licensed to practice law in the state of Illinois. Prior to his filing in bankruptcy, he was an active practitioner of law in Illinois primarily engaged in representing personal injury plaintiffs on a contingency fee basis.

2. The underlying bankruptcy case was commenced by Debtor's voluntary filing of a petition of relief under Chapter 11 of Title 11 U.S.C. ("the Bankruptcy Code") on April 16, 1996.

3. Debtor voluntarily converted his underlying bankruptcy case to one under Chapter 7 of the Bankruptcy Code on June 24, 1996.

4. William A. Brandt, Jr. ("Trustee") is the Chapter 7 Trustee in the underlying bankruptcy case.

5. William Hourigan ("Hourigan") is a citizen and resident of this District and was formerly an attorney licensed to practice law by the State of Illinois, and he practiced in that state.

6. Loraine Carlson ("Loraine") is Debtor's spouse. Debtor and Loraine had five children (the youngest, Lisa, was 14 years old in 1992). Tr. Ex. 50 at ¶ 3. They were divorced on February 19, 1992, with a decree requiring Debtor to pay $1,500 a month to Loraine to support Lisa until she reached "the age of majority." Tr. Ex. 50 at p. 0000515. Between the divorce and bankruptcy filing, a total of 46 payments of $1,500 each were due, totaling $69,000. Although Carlson did not list any debt to Loraine Carlson in his schedules, their testimony that such debt existed is credible and corroborated by the divorce decree. Given Mr. Carlson's fluctuating income as an attorney and increasing financial pressures in the years prior to bankruptcy, it is not surprising that he had fallen behind in his child support obligations and owed Loraine for them even though Lisa had come of age.

### The Practice Merger Agreement is not Enforceable

7. One issue relevant to each of these cases is the questioned validity of a Practice Merger Agreement ("PMA") (Trustee's Exhibit 1) executed between Debtor and Hourigan on December 27, 1995, a few months before the bankruptcy case was filed. For reasons discussed in the Conclusions of Law, the PMA is found and concluded to be void, voidable, and not enforceable. The entire PMA provided as follows (Trustee Exhibit 1):

Practice Merger Agreement

Between: William E. Hourigan and Dennis E. Carlson

Whereas: It is agreed between the parties hereto that it is desirable for Dennis E. Carlson to merge his practice into that of William E. Hourigan, and in the mutual interest of each parties [sic], they agree to the following terms and conditions:

General Provisions

1. That the effective date of this Agreement shall be January 1, 1996.

2. That Dennis E. Carlson shall maintain his office at 208 S. LaSalle St., Suite 1705, Chicago, Illinois, until the end of the lease term, and shall remain responsible for all payments on that lease.

3. That during the balance of the lease term, the name of William E. Hourigan shall appear on the door of that office over and covering the name of Dennis E. Carlson.

4. After the termination of the lease, all operations will be removed to' either the offices of William E. Hourigan or to a new suburban location of the parties.

5. That Dennis E. Carlson will maintain his Chicago telephone number at his expense until termination of the LaSalle St. Lease, to a call forward voice mail box. That once the number of calls diminishes to less than one every 6 months, at the options [sic] William E. Hourigan that number may be discontinued.

Until that time, after the termination of the lease, William E. Hourigan will pay for the line service only. If that number is used for outgoing calls, Dennis E. Carlson will pay those charges.

6. That, after the commencement of this agreement, Dennis E. Carlson will notify his clients on a case by case basis of the merger, and be responsible for all address change information being forwarded to the respective parties.

7. That after the Supreme Court rules on the petition for leave to file exceptions, and the parties are able to determine the effect of that ruling, the firm name will be The Law Offices of Hourigan and Carlson.

Compensation

1. Dennis E. Carlson will be responsible for any and all ordinary travel expense (not to include extraordinary case related expense) to be reimbursed by William E. Hourigan when collected from the client. Any uncollected case related expense incurred by Dennis E. Carlson on cases which he had in his office prior to the merger will remain his liability.

2. Payment to Dennis E. Carlson after the commencement of this agreement shall be as follows:

A. In the months of January and February, due to the fees expected to be forthcoming from work in progress, Dennis E.

Carlson will receive no draw from William E. Hourigan, but William E. Hourigan will not share any fees received during those two months. Fees for any case resolved during that period will belong to Dennis E. Carlson regardless of when the check arrives.

B. Commencing with March of 1996, Dennis E. Carlson will be paid $5,000 monthly, provided he has generated, in advance, $8,000 in fees.

If over any three month period, in excess of $8,000 is collected and it appears that Dennis E. Carlson will generate in excess of $100,000 per year in fees, then he will receive 30% of the excess fees based upon the estimation in the fourth month and each month thereafter, to be adjusted on a monthly basis.

If it appears on June 1 and December 31 accountings of each year that too much was paid out based upon actual production, then the draw for that month and following months will be reduced to adjust the overage.

If it appears at year end accounting that Dennis E. Carlson did not receive sufficient compensation based upon year end production. The balance will be paid him in one lump sum on December 31 of each year.

C. William E. Hourigan will be responsible for any and all case expense incurred after the effective date of this agreement, and any case expense paid by Dennis E. Carlson shall be paid him in addition to his draw when and if it is collected.

### Miscellaneous

1. It is agreed that Dennis E. Carlson is an independent licensed attorney and is an independent contractor. All work to be performed by him will be performed based upon his best ability, skill, and judgment, and he is free to handle cases assigned to him in the manner he sees fit, considering the ethics of the profession, and it is agreed that William E. Hourigan will be available to consult and advise, but when, where and how cases which are assigned to Dennis E. Carlson are handled is strictly up to him. It is agreed by the parties that Dennis E. Carlson has no set hours, no time to be in the office, and may come and go as he pleases, so long as his work is performed.

2. William E. Hourigan agrees, in addition to paying case expense, to pay all clerical and support staff and any and all office expense in connection with the operation of the practice and administration of the office.

3. This agreement may be terminated by either party within 60 days written notice.

In the even of termination, it is agreed that the cases transferred by Dennis E. Carlson shall remain with William E. Hourigan and Dennis E. Carlson will be compensated on a quantum meruit basis for work performed, providing there are time slips which have been filed on a weekly basis by Dennis E. Carlson documenting the work performed.

4. This is the whole agreement of the parties. This agreement may not be modified by the parties except in writing signed by each of them.

5. In the event that any portion of this agreement should be unenforceable in a court, it may be severed and not effect [sic] the enforceability of the remainder of the agreement.

8. The PMA thereby purported, as of its execution three and one-half months before Debtor filed for bankruptcy relief, to establish an association between Carlson and Hourigan. However, it is unintelligible and ridden with internal inconsistencies. While it referred to a merger of practices, it also specified that Carlson was to remain "independent." Neither Debtor nor Hourigan set forth or agreed to any list of cases which were supposedly included under it, and no such list was ever created by Mr. Carlson until he filed a list when ordered by this Court to do so in September of 1996. Trustee's Ex. 9, p. 2, ¶ 2. Hourigan testified that only "complex" cases were intended to be included under the PMA, though that was not specified in the document. Debtor testified that only "contingency fee" cases were to be included, though that was not specified in

the document. The PMA itself includes no limitation at all on cases intended to be included in the purported association except as to unspecified fees to be received by Mr. Carlson during January and February of 1996. *See* Trustee's Ex. 1, p. 2, ¶ 2A.

9. Neither Carlson nor Hourigan notified any of Carlson's clients of the "Agreement" as provided in ¶ 6 of the General Provisions. Nor did any of Debtor's clients execute any written consent to a division or sharing of legal fees between Hourigan and Carlson.

10. There is no language of assignment in the PMA, though both Hourigan and the Debtor testified that they meant for the Debtor's cases and fees to belong to Hourigan after that document was signed by them. Although the Debtor did not consider the PMA an "assignment" of his cases and fees to Hourigan, he testified that he viewed the document as creating a "contractual obligation" to pay over all his legal fees to Hourigan, though that was not specified in the document.

11. In their conduct following execution of the PMA, the Debtor and Hourigan routinely ignored its provisions. After the Debtor entered into the PMA, he directly received more than $16,000 in fee payments pre-bankruptcy between January 1, 1996, and March 31, 1996 (*see* Trustee's Ex. 28, Bates-stamped page 199), but he didn't pay any of those fees to Hourigan or into a joint account or into any account wholly or partially owned by Hourigan. Some of those payments received by check were kept by Debtor for his needs, and some he endorsed and delivered over to his former wife, Loraine Carlson. *See* Trustee's Ex. 34, Bates Stamp pp. 333–36. Based on their actions following entry into the PMA and notwithstanding that the PMA did not expressly exclude any of the Debtor's cases, fees received after his bankruptcy filing from Carlson's work on the Gonzalez personal injury case (discussed more fully below) were the only fees that Debtor and Hourigan treated as being included under the PMA. Such treatment of the Gonzalez fees occurred only after Debtor filed in bankruptcy when he asserted the view (once the undisclosed fees and payments to Hourigan were uncovered by the

Trustee's work) that the Gonzalez fee and expenses due to him for pre-bankruptcy work belonged to Hourigan instead of to the bankruptcy Trustee.

12. Debtor admitted that he received and dealt with as his own all fee payments received by him between December 27, 1995, when he and Hourigan entered into the PMA, and April 16, 1996, the date the Debtor filed bankruptcy under Chapter 11. The Gonzalez fee was the first money Hourigan is said to have received under the PMA, and that was when Hourigan received the Gonzalez settlement check on or about April 17 or 18, 1996, one or two days after Debtor filed his bankruptcy case. *See* Trustee's Ex. 43, Bates Stamp p. 399 (reflecting the opening deposit into Hourigan's "trust" account, which Hourigan admitted was the Gonzalez settlement check that he testified he received a day or two before depositing it); *see also* Debtor's Ex. 12 (list of transactions of Hourigan's "trust" account).

13. Debtor received two payments for legal fees after the PMA's effective date but prior to his bankruptcy filing. Debtor did not turn over either payment to Hourigan. The first payment was made in or about February of 1996. At that time, Debtor received a $1,500.00 payment for legal fees from his client Steven J. Booth by check dated February 18, 1996. Debtor did not pay that check to Hourigan, but instead endorsed the check and delivered it to his ex-spouse Loraine Carlson who then deposited it into her bank account at First National Bank of Chicago. The second payment was made in or about March of 1996. At that time, Debtor received a $500.00 payment for legal fees from his client Steven J. Booth by check dated March 24, 1996. Debtor did not give that check to Hourigan, but instead endorsed the check and delivered it to his ex-spouse Loraine Carlson who then deposited it into her bank account at First National Bank of Chicago.

14. In short, neither Carlson nor Hourigan treated the PMA as a binding contract until they thought it useful to do so after the bankruptcy filing by then treating a valuable fee asset from the Gonzalez case as belong-

ing to Hourigan instead of to the bankruptcy estate.

15. Hourigan testified when the PMA was signed that he knew the Debtor was facing potential large claims for personal sanctions he incurred in his litigated cases. Indeed, Hourigan was then representing Debtor in appeals from sanction judgments entered prior to execution of the PMA. Hourigan also acknowledged his awareness, when he and the Debtor executed the PMA, that Carlson was then facing disciplinary action that threatened his license to practice and that he therefore was threatened with further financial distress.

16. Debtor had insufficient assets to pay his debts and was insolvent at the time he entered into the PMA, and knew he was facing disciplinary action at that time.

17. Moreover, the PMA itself clearly recognized that disciplinary action against the Debtor's license to practice law was imminent as of the date it was signed. *See* Trustee's Ex. 1, p. 1, ¶ 7.

18. Debtor received no express consideration for his purported transfer of cases and fees to Hourigan pursuant to the PMA. Debtor and Hourigan testified in vague terms that the Debtor actually received something from Hourigan in exchange. Such testimony, however, did not establish any value of what the Debtor allegedly received. Other than Hourigan's supposed organizational skills, he gave the Debtor no property, or money, or services, or anything else of value in exchange for Debtor's outright transfer of all the Debtor's then existing and future rights to legal fees. No evidence was offered as to the value of any consideration Debtor supposedly received. The dearth of evidence as to the value of any consideration that Debtor allegedly received or work performed by either in connection with the PMA compels the conclusion that the Debtor received no valuable consideration at the time he purportedly transferred all his rights (if indeed he did so) in forthcoming legal fees to Hourigan.

### The Booth and Meyer Checks

19. In or about February of 1996, two months before Debtor filed in bankruptcy, Loraine Carlson received $1,500.00 by check dated February 18, 1996, from Debtor's client Steven J. Booth, which check was payable to Debtor and was endorsed by him for deposit into Loraine's FNB–Chicago account.

20. In or about March 1996 (still prior to the bankruptcy filing), Loraine Carlson received $500.00 by check dated March 24, 1996, from Debtor's client Steven J. Booth, which check was payable to Debtor and endorsed by him for deposit into Loraine's FNB–Chicago account.

21. When the bankruptcy case was filed, Debtor was owed a debt by Jerry and Shirley Meyer for legal services Debtor rendered and completed on their behalf prior to commencement of the underlying bankruptcy case. That debt was not scheduled on the bankruptcy filings.

22. On or about August of 1996, after converting the bankruptcy to Chapter 7, Debtor received a payment of $200 for prepetition legal services by check dated August 20, 1996, from Jerry and Shirley Meyer. Debtor endorsed that check and delivered it to Loraine Carlson.

23. On or about September of 1996, Debtor received a further payment of $200 for pre-petition legal services by check dated September 1, 1996, from Jerry and Shirley Meyer. Debtor endorsed that check and delivered it to Loraine Carlson.

24. Notations on the face of the Meyer checks suggest that Meyer was paying installments against a balance due on a prebankruptcy fee that had been due for some time.

25. The payments Debtor received in August and September 1996 from Jerry and Shirley Meyer constituted property of the Chapter 7 bankruptcy estate, and were not listed on the bankruptcy schedule as due.

### The Gonzalez Fees

26. Prior to filing of the underlying bankruptcy case, Debtor undertook legal representation of Carmen L. Gonzalez, individually and as mother, guardian, and next friend of Anthony Gonzalez, a minor ("Gonzalez").

27. Debtor's fee agreement with Gonzalez provided that Debtor was entitled to receive one-third of the amount recovered plus reimbursement of expenses.

28. In connection with his representation of Gonzalez, in 1991 Debtor filed suit in the Circuit Court of Cook County, Illinois, captioned *Gonzalez v. McDonough*, case no. 91 L 7512 ("Gonzalez case").

29. In January or February 1996, the defendant in the Gonzalez case agreed to pay Gonzalez $58,000.00 to settle that suit.

30. On March 1, 1996, Debtor filed a "Petition to Confirm Settlement of Minor's Claim or Reinstate" in the Gonzalez case.

31. On or about March 26, 1996, the Supreme Court of Illinois suspended Debtor's license to practice law for the period from March 26, 1996, through June 26, 1996.

32. On March 27, 1996, Judge Arthur Sullivan of the Circuit Court of Cook County, Illinois entered an order approving the settlement in the Gonzalez case. The order was entitled "Order for Law Division Approval of Settlement of Minor's Injury Claim per 5/8/95 Memorandum of Judges Budzinski, Cohen, Strayhorn." ("Order Approving Settlement") Settlement in the amount of $58,-000 was thereby approved.

33. When Debtor filed his bankruptcy case on April 16, 1996, the check for Gonzalez's settlement proceeds had not yet been disbursed.

34. When Debtor's underlying bankruptcy case was filed, his Illinois license to practice law had been and was then still suspended.

35. All legal services that Debtor rendered in connection with the Gonzalez case were rendered before he filed in bankruptcy.

36. As stated, Debtor and William Hourigan had already executed the PMA for no consideration. Also, Mrs. Gonzalez never executed any written consent to a division or sharing of legal fees between Debtor and William Hourigan, or to an assignment to Hourigan of any fees due to Debtor.

37. After Mr. Carlson filed his underlying bankruptcy case on April 16, 1996, on or about April 17, 1996, a check in the amount of $58,000 for gross proceeds of the Gonzalez case settlement was delivered to Hourigan. Hourigan had obtained Probate Court approval of the minor's settlement prior to the bankruptcy filing as Debtor's license to practice was then under suspension.

38. Hourigan deposited net proceeds of the Gonzalez settlement into his bank account on or about April 16, 1996, after paying the client's share. Payment due Carlson from the settlement totaled $21,490.67, $19,-333.33 for his fee and $2,157.34 for expenses.

39. After receiving the Gonzalez net settlement proceeds and subsequent to filing of the underlying bankruptcy case in Chapter 11 on April 16, 1996, William Hourigan paid to Debtor most of the fees and expenses due Debtor from proceeds of the Gonzalez settlement and, at Debtor's direction, the rest to Loraine Carlson. Hourigan paid himself $1,500 and also paid out the following checks to Debtor and Loraine from the Gonzalez settlement fee and expenses:

Between Bankruptcy Filing in Chapter 11 and Conversion to Chapter 7

| | | |
|---|---|---|
| April 22, 1996 | $ 5,000 | to Dennis Carlson |
| April 22, 1996 | $ 1,500 | to Dennis Carlson |
| May 1, 1996 | $ 1,000 | to Loraine Carlson |
| May 6, 1996 | $ 5,000 | to Dennis Carlson |
| May 28, 1996 | $ 4,900 | to Dennis Carlson |
| June 25, 1996 | $ 500 | to Loraine Carlson |
| TOTAL | $16,400 | |

After Conversion on June 26, 1996, to Chapter 7

| | | |
|---|---|---|
| June 28, 1996 | $2,000 | to Dennis Carlson |
| July 9, 1996 | $1,000 | to Dennis Carlson |
| July 18, 1996 | $ 400 | to Dennis Carlson |
| July 31, 1996 | $ 750 | to Dennis Carlson |
| August 15, 1996 | $ 50 | to Dennis Carlson |
| August 16, 1996 | $ 45 | to Dennis Carlson |
| August 21, 1996 | $ 50 | to Dennis Carlson |
| TOTAL | $4,295 | |

40. Thus, out of $21,490.67 that Hourigan received belonging to Carlson as fees and expenses from the Gonzalez case settlement, he paid out $16,400 to Mr. Carlson and Loraine, plus $1,500 to himself before the bankruptcy converted to Chapter 7, leaving $3,590.67. Hourigan paid out $4,295 after conversion to Chapter 7, which was $704.33 more than the balance remaining. He thereby treated part of the $1,500 taken for himself as held for Carlson and used it to complete the payments post-conversion to Carlson. All these payments were to give Carlson a cash flow to live on and to pay his former wife support for their child that he owed under their divorce decree.

41. No part of the $19,333.33 contingent fee or $2,157.34 in expense reimbursement due Debtor from the Gonzalez case was paid to the Trustee. Hourigan paid himself the $1,500 to compensate himself only for his work in finishing up the Gonzalez case while Carlson was under suspension. Based on evidence submitted, a reasonable fee for Hourigan's time in closing the Gonzalez settlement was no more than $500, plus he had advanced $85 in expenses. He impliedly recognized that he was not due the $1,500 paid to himself when he paid part back to Debtor.

42. After receiving the Gonzalez settlement proceeds, at Debtor's direction Hourigan disbursed eight checks from the account in which Hourigan had deposited the Gonzalez settlement proceeds that ended up being deposited into Lorraine's account. Thus, all eight checks paid to Loraine were from fees and expenses due Debtor from the settlement of the Gonzalez case.

43. Some of the eight checks were payable to Debtor and were subsequently endorsed by Debtor and delivered by him to Loraine; the rest were payable directly to Loraine Carlson. Loraine deposited all eight of those checks into her account number 0540010073 at First National Bank of Chicago ("Loraine's FNB–Chicago account").

44. The monies Debtor earned or received from the Gonzalez case, from Steven J. Booth and from Jerry and Shirley Meyer, which Debtor transferred or caused to be transferred to Loraine Carlson were contended and testified by Debtor and Loraine to constitute back due maintenance or support owed by Debtor to Loraine Carlson. While Debtor and Loraine offered no payment records to document that payments to Loraine were for back due support or maintenance, their testimony was corroborated by their divorce decree and not rebutted by Plaintiff.

### False Oaths, Omissions, and Failure to Preserve Records

45. On September 30, 1996, an order was entered in the underlying bankruptcy case directing Debtor to prepare and submit to the Trustee and to two creditors lists of cases he was handling for clients when the bankruptcy was filed ("lists of cases"). *See* Trustee's Ex. 9, the 9/30/96 Court Order

46. In or about October 1996, Debtor submitted an initial list of cases from which he later claimed to have inadvertently omitted several matters. Debtor subsequently submitted an amended list of cases. *See* Trustee's Ex. 14, pp. 88–90; Debtor's Ex. 17. However, Debtor never disclosed the Gonzalez case on these or any other list of cases submitted to the court.

47. Debtor also intentionally failed to disclose on those lists his lawsuit in the case *Pedersen v. Intinni,* case no. 86 L 16555, in the Circuit Court of Cook County, Illinois, a case which might have value to the estate if it were to be successful. *In re Carlson,* 211 B.R. 275 (Bankr.N.D.Ill.1997). Mr. Hourigan testified that Meyer was one of the plaintiffs in that matter, that Carlson withdrew as attorney from that case in 1995, and that Carlson did not reappear in that case until some time after Hourigan had been suspended from the practice of law on September 28, 1996.

48. At his examination taken pursuant to Fed. R. Bankr.P.2004 in December of 1996, Debtor testified falsely that he had disclosed all cases called for pursuant to this Court's order in the lists of cases, although he had failed to disclose the *Gonzalez* and *Pedersen* cases.

49. In his response to Question No. 3 of Debtor's Statement of Affairs filed under oath by Debtor with his bankruptcy petition, Debtor failed to disclose his payments to Loraine Carlson pre-bankruptcy of legal fees received from clients.

50. In his responses to Item No. 13 of Debtor's Schedule B and Debtor's Statement of Affairs, both filed under oath by Debtor with his bankruptcy petition, Debtor knowingly and falsely failed to disclose his purported assignment or transfer to William E. Hourigan of rights Debtor had to fees for legal services, or to disclose the PMA entered into with Hourigan.

51. In response to Item No. 15 of Debtor's Schedule B, Debtor knowingly and falsely failed to disclose his right to legal fees and reimbursement of expenses in connection with the Gonzalez case.

52. In response to Question No. 1 on his Statement of Financial Affairs, Debtor knowingly and falsely stated he had no income for the period from January 1, 1996, through the date he filed his bankruptcy case. Incredibly, he reported no income during the two years preceding the filing of his bankruptcy case, though he was engaged in law practice during each of those years by which he supported himself.

53. In response to Item No. 2 in his bankruptcy schedules and in response to Question No. 11 in his Statement of Financial Affairs, Debtor failed to disclose one financial account he had at or immediately preceding the commencement of his case, namely his account at Bank One.

54. The Trustee attempted over many months to obtain documents from Debtor. After considerable effort in that connection, some documents were produced by Debtor and Mrs. Carlson. However, Debtor failed to keep or preserve many documents regarding his financial affairs and transactions that

he should have kept to permit the Trustee to examine into his affairs. Findings Nos. 55 through 62.

55. Debtor failed to preserve $9,990 in canceled checks from the debtor-in-possession ("DIP") bank account he maintained at Old Kent Bank during the Chapter 11 period of his bankruptcy case. That account received deposits that Debtor admitted receiving and disbursing during the Chapter 11 phase of his bankruptcy. Debtor admitted that he did not have the canceled checks from his DIP account, but claimed the bank failed to send those checks to him.

56. Debtor also failed to produce a record of receipts and disbursements from his law practice, though he described a "book" of such records in testimony at his examination under Fed. R. Bankr.P.2004. Likewise, Debtor failed to produce any comprehensive record of his active law practice to show his receipts, expenses and/or receivables due from his practice, or to inventory his possible contingent fees or work in progress.

57. Debtor further failed to produce receipts and payment records showing disbursements from his law practice. Debtor admitted in his testimony that he has no documents to explain how he spent the proceeds of the checks that he did produce for the Trustee. *See* Trustee's Exs. 26, 28, and 31. Debtor admitted that he had no records, other than his 1995 federal income tax return to indicate how he disposed of any of the $44,000 in income he received during 1995.

58. Debtor failed to produce any documents setting forth amounts due Debtor as of the date of the commencement of the underlying bankruptcy case for legal services rendered and expenses advanced. Debtor denied he was owed any receivables as of commencement of the bankruptcy case by virtue of the PMA. Apart from the invalidity of the PMA, he failed to keep records of his law business to enable full scrutiny of whether the PMA was treated by the parties as a real agreement. Therefore, the Debtor's failure to make or keep accounts receivable records is quite material.

59. Debtor also admitted that he had no documents to support or explain any of the

deductions for business expenses he took on Schedule C of his 1995 tax return. Likewise, no documents are available which would explain deductions Debtor took on his 1995 federal tax return for mortgage interest and real estate taxes. Debtor testified that those deductions were a "mistake" because he made no such payments for real estate taxes or mortgage interest on any real estate during 1995. He explained that he had taken the deductions in error. Assuming *arguendo* the truth of that testimony, it only made manifest the fact that the 1995 tax return was an unreliable document and underlines the importance of Debtor's failure to keep reliable records for that year and other years. Debtor's 1995 tax return was certainly not a complete or reliable source of information regarding his transactions for that year.

60. At his Rule 2004 examination, Debtor testified that Loraine Carlson had possession of a "book" of receipts and disbursements from Debtor's law practice.

61. While Loraine Carlson may have once possessed recorded information referring to or having as a subject Debtor's property or financial affairs, possibly including Debtor's "book" of receipts and disbursements from his law practice, it was not proved that she retained it after Debtor's bankruptcy was filed, or that she is now withholding it.

62. Finally, Trustee William A. Brandt, Jr. testified that all the records Debtor ever delivered to the Trustee regarding his financial transactions or business are included in the Trustee's trial exhibits, thereby establishing the limit of records produced.

63. Findings of Fact contained in the Conclusions of Law will stand as additional Findings of Fact. Conclusions of Law set forth in the Findings of Fact will stand by this reference as additional Conclusions of Law.

### CONCLUSIONS OF LAW

1. Jurisdiction lies over these Adversary proceedings pursuant to Title 28 U.S.C. § 1334, and the proceedings were referred by the District Court under Local District Court Rule 2.33(A).

2. These are core proceedings pursuant to Title 28 U.S.C. § 157(b)(2) in which a bankruptcy judge may enter final judgments.

3. Venue is proper in this District pursuant to Title 28 U.S.C. § 1409(a).

4. The standard of proof applicable to each Adversary proceeding is the preponderance of evidence. *Grogan v. Garner,* 498 U.S. 279, 290–291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

### *The PMA is Unenforceable*

5. Debtor entered into the PMA with intent to hide his earned fees from creditors and the Trustee during his subsequent bankruptcy, as evidenced by his omission of any mention of it in his bankruptcy schedules or statement of financial affairs. Trustee's Ex. 6. Nor did Debtor show anywhere in his schedules or statement of affairs that he was owed any accounts receivable. Clearly, even if the Debtor believed he was owed no receivables by virtue of his prior PMA agreement with Hourigan under the PMA, he had a duty to disclose any transfer of rights in response to Question 10 in his Statement of Affairs filed in bankruptcy. However, he disclosed neither any receivables nor his purported transfer of receivables to Hourigan under the PMA.

6. Based on Findings earlier stated and authorities cited below, the PMA was unenforceable and the Gonzalez fee and reimbursed expenses were property of the bankruptcy estate.

7. As stated, neither Carlson nor Hourigan ever obtained written consent of any of Carlson's clients for his purported agreement to give to or share his fees with Hourigan, not at the time they entered into the PMA or afterwards. Because the PMA did not establish a law partnership or firm, if it is read as a fee transfer or sharing agreement, it constituted an illegal and unenforceable contract to share fees by reason of Rule 1.5(f) of the Illinois Rules of Professional Conduct ("Rule 1.5(f)") and was void and unenforceable under that Rule.

8. Rule 1.5(f) provides:

Except as provided in Rule 1.5(j),[1] a lawyer shall not divide a fee for legal services with another lawyer who is not in the same firm, unless the client consents to employment of the other lawyer by signing a writing which discloses:

(1) that a division of fees will be made;

(2) the basis upon which the division will be made, including the economic benefit to be received by the other lawyer as a result of the division; and

(3) the responsibility to be assumed by the other lawyer for performance of the legal services in question.

(Emphasis supplied.)

■ 9. The rationale underlying Rule 1.5(f) is that clients are not to be treated like trade goods, and an undisclosed division or sharing of legal fees between lawyers undermines the undivided loyalty of the lawyer to the client. The client's express written consent to such division or sharing is therefore required. Contracts between lawyers that violate Rule 1.5(f) are illegal in Illinois. *Corti v. Fleisher*, 93 Ill.App.3d 517, 522–23, 49 Ill.Dec. 74, 417 N.E.2d 764 (1st Dist.1981); *In re Del Grosso*, 111 B.R. 178, 184–85 (Bankr.N.D.Ill.1990).

■ 10. Under Illinois law, illegal contracts are void and unenforceable. *U.S. Nursing Corp. v. Saint Joseph Medical Center*, 39 F.3d 790, 792 (7th Cir.1994); *In re Randy*, 189 B.R. 425, 441 (Bankr.N.D.Ill. 1995).

11. Hourigan admitted in his testimony that he never obtained and never saw any consent signed by Mrs. Gonzalez for the Debtor to share his fees from the Gonzalez case with Mr. Hourigan. The Debtor also admitted that Mrs. Gonzalez did not execute any written consent as required by Rule 1.5(f). Though Debtor claimed that Mrs. Gonzalez consented "on the record" before the state probate court to Debtor's sharing of legal fees with Hourigan at an alleged hearing, he admitted on cross-examination that she never signed any consent containing disclosures required under Rule 1.5(f) at that hearing or at any other time. Moreover, neither Debtor nor Hourigan ever produced in evidence any document of any kind purportedly signed by Mrs. Gonzalez or Anthony Gonzalez, nor any transcript of the purported oral consent before the state probate judge.

12. Debtor and Hourigan argue that Hourigan was permitted under Rule 1.5(f) to obtain the Debtor's fees from the Gonzalez case because they were part of the same "firm" created by the PMA. However, the evidence did not establish that any such "firm" existed. Hourigan and Carlson were never partners, they were never part of a professional corporation, and nether were ever employees of the other. The PMA itself answers the question of whether a "firm" ever existed; it expressly provided that Mr. Carlson was to remain an "independent licensed attorney and . . . an independent contractor." *See* Trustee's Ex. 1, p. 3, ¶ 1 (under "Miscellaneous"). Finally, there was no proof offered to show that any federal or state firm or partnership tax return was ever filed.

### *Brandt v. Dennis Carlson—Adversary No. 97 A 00967*

### *Count I— § 727(a)(2)*

### *Alleged concealment or transfer of property*

In Count I of his Adversary Complaint, the Trustee alleged that the Debtor transferred property of the Debtor within the one year preceding the filing of the bankruptcy petition, and also transferred property of the bankruptcy estate after the petition was filed.

13. Section 727(a)(2) of the Bankruptcy Code provides:

(a) The court shall grant the debtor a discharge, unless -

. . . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed -

---

1. Rule 1.5(j) relates to separation or retirement agreements and is not applicable here.

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2).

■ 14. The Debtor's intent under § 727(a)(2)(A) may be proved by circumstantial evidence. *In re Braun*, 98 B.R. 382 (Bankr.N.D.Ill.1989); *In re Peacock*, 154 B.R. 597, 599 (Bankr.M.D.Fla.1993).

15. To the extent, if any, that the PMA was a valid agreement, for reasons stated above it constituted a fraudulent transfer of property of the debtor within the one year before the bankruptcy petition with intent to hinder creditors. Moreover, the Debtor concealed the forthcoming Gonzalez fee and expense recovery in his bankruptcy schedules. He therefore concealed property from his creditors and the Trustee.

■ 16. The Gonzalez fees were part of the bankruptcy estate. This Court's earlier opinion and authorities is a starting point on the issue of a lawyer's right to the earned value of contingent fees (*In re Carlson*, 211 B.R. 275 (Bankr.N.D.Ill.1997)), and described the possible rights of a bankruptcy trustee to such fees. The Gonzalez fee was no longer contingent when the bankruptcy was filed. All of Carlson's legal services in connection with the Gonzalez injury case were rendered pre-bankruptcy, and all fees and expenses due him in connection with that case were due when his bankruptcy petition was filed in Chapter 11. Therefore, the entire amount of fees and expenses due to Carlson from his work on the Gonzalez case constituted property of the bankruptcy estate, less a reasonable fee due to Hourigan for his work closing the Gonzalez settlement while Carlson's license to practice law was suspended.

17. Carlson had his fee agreement with Mrs. Gonzalez, not Hourigan. Carlson litigated the Gonzalez case for five years from start to finish, settled it, and obtained approval of the settlement pre-bankruptcy on March 27, 1996. *See* Trustee's Ex. 4 (order approving Gonzalez settlement). Carlson obtained approval of the Gonzalez settlement from the Law Division of the Circuit Court.

The next day he was suspended from the practice of law for sixty days (*see* Trustee's Ex. 5 (suspension order)), so Hourigan had to do the probate court work.

18. Hourigan testified that he obtained the settlement check on or about April 17 or 18, 1996, with Mr. Carlson's blessing, before the Debtor's suspension period was over and only a day or two after the Debtor filed his bankruptcy case. Carlson has not contended that he in any way engaged in the unauthorized practice of law during his suspension. Therefore, all of his legal services rendered as to the Gonzalez case were rendered pre-bankruptcy, and all fees and expense reimbursement due him (after paying Hourigan a reasonable fee due for the probate work) constituted property of the estate, first when Debtor was in possession under Chapter 11 and later after conversion to Chapter 7.

19. After filing of his bankruptcy case, Carlson caused and permitted estate property consisting of all his fees and expenses due from the Gonzalez case to be transferred to Mr. Hourigan as part of his concealment of them. As proven (*see* checks included as part of Trustee's Ex. 40, pp. 372–80; *see also* Debtor's Ex. 11), the Debtor ultimately received post-bankruptcy out of those monies, directly or indirectly through payments to Loraine, a figure totaling $19,100.00. Those payments came out of Debtor's fees from the Gonzalez case plus reimbursed expenses. *See* Trustee's Ex. 4. Of those payments, $4,295 in estate funds were paid after conversion to Chapter 7.

■ 20. The Debtor was entitled to handle his estate funds during the Chapter 11 phase in normal course. 11 U.S.C. §§ 1107, 1108. That included his living off his fees and paying ordinary debts such as back due child support. However, the Debtor committed acts in violation of § 727(a)(2)(A) by attempting to hide the forthcoming Gonzalez fee pre-bankruptcy through the PMA, and in violation of § 727(a)(2)(B), by allowing and causing transfers of the Meyer's fees and remainder of the Gonzalez fees post-conversion. His discharge should therefore be denied for this reason alone.

**654**

21. Debtor's concealment of the Gonzalez fees and expenses from his bankruptcy schedules, and his permitting the transfer to William Hourigan of the $21,490.67 in fees and expenses due Debtor in connection with the Gonzalez case, was done with intent to hinder, delay, or defraud his creditors, and in order to hide the fact that most of such funds were funneled through Hourigan for return to Carlson to use for his needs and purposes in a way unlikely to be traced. Such intent is evident even though part of those funds were not improperly transferred to Carlson during the Chapter 11 phase.

22. Carlson transferred the two checks from his clients Jerry and Shirley Meyer to Loraine Carlson during August and September 1996, after conversion to Chapter 7. *See* Trustee's Ex. 35, pp. 340–41. The only issue in dispute as to these checks was as to when Mr. Carlson rendered the legal services for which the two payments were made. Mr. Carlson's testimony on that point was equivocal; he could not recall whether the checks were payments for services rendered or payments of a retainer for future services. However, the evidence showed they were payments for services rendered pre-bankruptcy. *See* Findings of fact at ¶ 46. It follows from Mr. Hourigan's testimony that Mr. Carlson had not done any legal work for the Meyers prior to receiving the two checks since sometime in 1995. Moreover, notations on the checks suggest that the Meyers were making installment payments against a balance that had been outstanding for some time. The conclusion to draw from the foregoing evidence is that the Meyer payments were for services rendered by the Debtor in 1995, long before he filed his bankruptcy petition that were paid after filing of Debtor's bankruptcy on April 16, 1996, and after conversion to Chapter 7 in June of that year. The Debtor should not have endorsed those checks and delivered them to Loraine Carlson. Rather, the check proceeds belonged to the estate, and when received or made available during the Chapter 7 phase, should have been delivered to the Trustee.

23. Debtor's concealment and transfer to Loraine Carlson of those pay-ments he received in August and September 1996 for legal fees owed by Jerry and Shirley Meyer was done with intent to hide these payments from the Trustee.

24. Although not every mistake by a debtor requires use of the provision that bars him or her for life from financial relief, this Debtor's foregoing conduct and omissions cumulatively warrant that judgment.

### Count II— § 727(a)(3)
### *Failure to keep or preserve books and records*

In Count II of his Complaint against Debtor, the Trustee has alleged that Carlson failed to keep or preserve documents regarding his financial affairs and transactions and that his discharge should therefore be denied under § 727(a)(3) of the Bankruptcy Code.

25. Section 727(a)(3) provides that:

(a) The court shall grant the debtor a discharge, unless -

.     .     .     .     .

3. the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case.

26. Fraudulent intent is not a required element under § 727(a)(3). *In re Erdheim*, 197 B.R. 23, 29 (Bankr.E.D.N.Y. 1996); *In re Wiess*, 132 B.R. 588, 592 (Bankr. E.D.Ark.1991).

27. Every debtor has a duty to take reasonable precautions to maintain and preserve records of their financial transactions and affairs. *In re Hyder*, 38 B.R. 467, 471 (Bankr.D.Mass.1984).

28. A trustee should not be required to drag information from a reluctant and uncooperative debtor, nor should a trustee be compelled to reconstruct a debtor's transactions in order to ascertain a debtor's financial condition. *Matter of Juzwiak*, 89

F.3d 424, 428 (7th Cir.1996); *In re Wiess,* 132 B.R. 588, 593 (Bankr.E.D.Ark.1991).

29. Creditors and the Trustee are not required to accept Debtor's oral recitations or recollections of his transactions; rather, to qualify for a discharge in bankruptcy, a debtor is required to keep and produce written documentation of all such transactions. *Matter of Juzwiak,* 89 F.3d 424, 429–30 (7th Cir.1996).

30. The preponderance of evidence demonstrates that Debtor failed to obtain, make, or keep any of the following records:

a. Canceled checks from the debtor-in-possession ("DIP") bank account he maintained at Old Kent Bank during the Chapter 11 period of this case.

b. The record or "book" or receipts and disbursements from his law practice which the Debtor described at his Rule 2004 examination.

c. Any documents setting forth income and disbursements from his law practice or otherwise.

d. Any documents setting forth amounts due Debtor as of the bankruptcy filing date for legal services rendered and expenses advanced, or inventory of cases in progress.

e. Any documents regarding deductions claimed on Carlson's 1995 tax return for mortgage interest and real estate taxes.

31. The Trustee also complains that Carlson did not give him any documents relating to his divorce from Loraine Carlson. Debtor admitted that, although he had agreed to provide the Trustee with a copy of his divorce decree at his Rule 2004 examination in December 1996, he never did, leaving it to the Trustee to obtain that decree. However, that decree was a public document well within reach of the Trustee, and Carlson's failure to retain a copy was not a material document omission.

32. Evidence clearly established that the Debtor failed to keep or preserve sufficient documents and recorded information from which his financial condition or business transactions might be ascertained.

33. Debtor is a licensed attorney. His failure to keep or preserve such documents and recorded information is not justified under the circumstances of his history, his occupation, and this case. Further, what he did produce did not enable the Trustee to examine fully into the Debtor's affairs. His discharge should therefore be denied under § 727(a)(3) of the Bankruptcy Code. *In re Erdheim,* 197 B.R. 23, 29–30 (Bankr. E.D.N.Y.1996).

### Count III— § 727(a)(4)(A)

#### Alleged false oaths

In Count III of his Complaint against Debtor, the Trustee has alleged that the Debtor is guilty of false oaths and accounts during this case and that his discharge should therefore be denied pursuant to § 727(a)(4)(A) of the Bankruptcy Code.

34. Section 727(a)(4)(A) of the Bankruptcy Code provides:

§ 727. Discharge

(a) The court shall grant the debtor a discharge, unless -

.    .    .    .    .

4. the debtor knowingly and fraudulently, in or in connection with the case -

(A) made a false oath or account;

35. The Debtor's fraudulent intent under § 727(a)(4)(A) may be inferred from circumstantial evidence. *In re Bosse,* 200 B.R. 419, 421 (Bankr.S.D.Fla.1996).

36. The purpose of § 727(a)(4)(A) is to ensure that dependable information is supplied to those interested in the administration of the bankruptcy estate so that they can rely upon it without having to make an extraordinary effort to dig out the true facts through examinations or investigations. *In re Syrtveit,* 105 B.R. 596, 597 (Bankr.D.Mont. 1989).

37. The Debtor's fraudulent intent in concealing the Gonzalez case on the lists of cases he submitted can be inferred from the following facts and circumstances:

(a) Debtor was under a court order in his bankruptcy case (Trustee Exhibit 9) to

disclose the Gonzalez case and failed to do so despite the fact it was the only case as to which he actually transferred fees to Hourigan, purportedly under the PMA.

(b) The source of payments Debtor had been receiving from Hourigan beginning in April 1996 and continuing through August 1996 (*see* checks contained in Trustee's Exhibit 40 and Debtor's Exhibit 12) was from fees due Debtor from the Gonzalez case, making it highly unlikely that the Debtor's failure to list the case was merely inadvertent. Moreover, Debtor's testimony at trial in response to a question by the Court was that he did not understand paragraph 2 of the Court's September 30, 1996, Order to require him to list the Gonzalez case. Again, Debtor is a licensed attorney. The language of that Order is not susceptible to misunderstanding by the lawyer-Debtor.

38. The overwhelming evidence leads inescapably to the conclusion that his failure to disclose the Gonzalez case in his bankruptcy schedules and in the List of Cases was knowing, intentional, and fraudulent so as to prevent the Trustee from learning about the Gonzalez fee.

39. At his examination taken pursuant to Fed. R. Bankr.P.2004 in December of 1996, Debtor falsely testified that he had disclosed all cases required for the List of Cases. for pursuant to this Court's order in the lists of cases. *See* Trustee's Ex. 12 (transcript) pp. 57–58. The falsity of that testimony is clear. The Debtor's fraudulent intent in that false testimony can be inferred from the circumstances outlined above.

40. In his Statement of Affairs filed with this Court and in his response to Question 3 of the Statement, Debtor knowingly and fraudulently failed to disclose his payment to Loraine Carlson of fees due him from his legal services. Those included fees from Steven J. Booth as well as the fee money from Gonzalez. *See* Trustee's Ex. 35, pp. 333–36 (checks from Steven Booth); *see also* Trustee's Ex. 6, p. 36, Question 10 (Statement of Affairs). Debtor admitted that he did not disclose these transfers to Loraine, and his

fraudulent intent in that regard can be inferred from (a) his concealment of the transfers in his statement of affairs; (b) his failure to schedule his accounts receivable including the Booth and Gonzalez fees; and (c) his failure to list any debt or payment to Loraine Carlson in his schedules (Trustee's Ex. 6).

41. In Schedule B filed with this Court in response to Item 13, and in response to Question 10 on his Statement of Financial Affairs, Debtor failed to disclose his purported assignment to William E. Hourigan of all rights Debtor had to fees for legal services. Debtor's failure to disclose any such transfer or assignment is apparent from review of Debtor's schedules (Exhibit 6). Mr. Carlson's fraudulent intent in not revealing that purported assignment can be inferred from the circumstances that (a) Debtor was insolvent and received no value at the time of transfer (if there was a transfer); and (b) because, based on the terms of the PMA, it appears the Debtor's intent was to convert pre-bankruptcy legal fee receivables into post-bankruptcy payment to Hourigan that could then be funneled to Debtor and Loraine so as to keep them from his creditors, a goal which was carried out.

42. In his bankruptcy Schedule B and in response to Item 15, Debtor failed to disclose his right to legal fees and reimbursement of expenses in connection with the Meyer services and the Gonzalez case. The Debtor's failure to disclose those receivables, as well as any other receivables, was both admitted by the Debtor and apparent from review of the Debtor's schedules (Trustee's Exhibit 6). The Debtor's fraudulent intent in failing to make said disclosure is established by the fact that he disclosed neither any fee receivables nor his purported assignment or transfer of all his receivables to Hourigan.

43. If Debtor's explanation that he scheduled no receivables because he had assigned them to Hourigan had been bona fide, he would have disclosed the assignment through the PMA. However, he disclosed neither the assignment nor the receivables. Had Mr. Carlson disclosed the existence of the PMA and the fees he was due from Meyer and the Gonzalez settlement (approval of the latter settlement having been obtained just prior to

filing his bankruptcy petition), the United States Trustee or the creditors in Chapter 11 or the Trustee in Chapter 7 could have taken action to prevent those funds from being dissipated. However, his failure to disclose either the PMA or the receivable denied any party any opportunity to take any action to preserve those assets for the estate in Chapter 7.

44. In response to Question 1 on his Statement of Financial Affairs, Debtor stated he had no income for the period from January 1, 1996, through the bankruptcy petition filing date, and no income during the two years preceding the commencement of his case. The falsity of this answer is apparent from review of the Debtor's tax return (Trustee's Exhibit 16) and the Debtor's statements of receipts for 1995 (Trustee's Exhibit 27, pp. 197–98) and 1996 (Trustee's Exhibit 28, p. 199). Mr. Carlson's explanation for his false answer, that he misread the question and believed it called for net income, is not credible. The explanation is particularly incredible in light of the fact that Mr. Carlson is an attorney supposedly trained in reading legal documents and in light of his 1995 tax return which showed $44,000 income for that year.

45. In response to Item 2 in his bankruptcy schedules filed, and in response to Question 11 in his statement of financial affairs filed, Debtor failed to disclose each financial account he had at or immediately preceding the commencement of his bankruptcy case, namely his account at Bank One. The Debtor admitted that he had the account open at Bank One at the time he filed his bankruptcy case, and that he failed to disclose it. The Debtor's fraudulent intent in failing to make such disclosure can be inferred from the fact that he was using that account at least as late as the month before he filed for bankruptcy to deposit and spend fees (*see* Trustee's Exhibit 33), and from the fact that despite the Court's order to produce all records of receipts and disbursements for his law practice from April 16, 1995 through June 24, 1996 (Trustee's Exhibit 18), the Debtor never produced any records relating to this bank account.

46. In order for the bankruptcy system to function, the Trustee must be able to rely on information supplied in a debtor's schedules and statement of affairs in the first instance as the primary resource for information regarding the Debtor's assets, liabilities, and financial affairs. *In re Yonkers*, 219 B.R. 227, 233 (Bankr.N.D.Ill.1997). That was not possible in this Debtor's bankruptcy case.

### Brandt v. William Hourigan—97 A 00850

The Trustee sought an accounting and turnover from Mr. Hourigan of payments he received of Mr. Carlson's legal fees pursuant to § 542(a) of the Bankruptcy Code.

47. Section 542(a) of the Bankruptcy Code provides for turnover of property to the trustee by requiring:

> (a) ... an entity ... in possession, custody, or control during the case, of property that the trustee may use, sell, or lease under section 363 of this title or that a debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property....

> .　　.　　.　　.　　.

[However,]

> (c) ... an entity that has neither actual notice nor actual knowledge of the commencement of the bankruptcy case concerning the debts may transfer property of the estate, or pay a debt owing to the debtor in good faith....

11 U.S.C. § 542.

48. The accounting for Gonzalez fee monies received by Mr. Carlson appears to have been fully provided by Mr. Hourigan. He produced all bank statements from his trust account. Exhibit 43. Hourigan also produced all checks he wrote on that account (Exhibits 40 and 44), and identified the source of all deposits into that account. Exhibit 46.

49. Of the approximately $63,000 Mr. Hourigan received from Mr. Carlson's cases (Defendant's Exhibit 12), $58,000 came from the Gonzalez case. Mr. Hourigan provided a copy of his check from the settlement (Exhibit 44, pp. 416–17) which reflects that, of the $58,000 of the gross amount of the Gon-

zalez settlement, $36,509.33 was disbursed to a segregated account for Anthony Gonzalez, the minor. The balance of $21,490.67 constituted the total amount of legal fees and expenses due Mr. Carlson from the Gonzalez settlement.[2] Of that amount, $19,333.33 constituted the Debtor's fees, according to the order approving the settlement (Exhibit 4), with the remaining $2,157.34 constituting reimbursement of the Debtor's expenses.[3]

50. Other than the PMA, Mr. Hourigan has neither alleged nor established any basis upon which he was entitled to share or receive any part of the Debtor's legal fees from the Gonzalez case, except a minor portion ($500) to pay his work and expenses ($85) for closing the Gonzalez settlement while Carlson was under suspension. For reasons stated earlier herein, the PMA itself was fraudulent and illegal; it cannot justify Hourigan receiving any part of the Debtor's fees from the Gonzalez case or from any other case.

51. Trustee argued by post-trial motion under Fed.R.Civ.P. 15(b) (Fed. R. Bankr.P. 7015) that he should be allowed to conform his pleadings to the proof adduced at trial so as to seek avoidance of the PMA and all payments to Hourigan thereunder as a fraudulent transfer within the meaning of § 548(a) of the Bankruptcy Code and to seek avoidance of the post-petition transfer of the Debtor's fees from the Gonzalez case to Hourigan as an improper post-petition transfer within the meaning of § 549(a) of the Bankruptcy Code. That motion was presented after the trial completed and proofs were closed, and during the period that final arguments were being prepared and filed in writing. For reasons given at the time, that motion was denied. Therefore, the Trustee may not now seek avoidance of the PMA under § 548(a) or request relief under § 549(a). Nonetheless, Hourigan is liable to account under § 542(a) for turnover of estate funds received by him from the Gonzalez settlement after bankruptcy was filed. As it happens, he did in fact turn over during the Chapter 11 period a total of $16,400 to the Chapter 11 debtor-in-possession Carlson, both directly and indirectly by paying Lo-

raine support debt owed to her by Carlson. Since Carlson as debtor-in-possession could during the Chapter 11 phase obtain and expend money in the normal course of his law business and life, Hourigan did not improperly direct estate property during the Chapter 11. However, the total of $4,295 that he paid out to Carlson during the Chapter 7 from bankruptcy estate funds should have been turned over to the Chapter 7 Trustee. He was not ignorant of the Chapter 7 phase, and his payments to Carlson were at that time not in good faith. It is not good faith to help a friend in bankruptcy avoid turning over assets to a Trustee.

52. Hourigan petitioned in the state court for allowance of fees (admitted into evidence as part of Exhibit 40, pp. 388–393). His petition, however, was not approved by that court. The amount he sought in that petition was a fee of $500 plus $85 for costs. Although his fees were not approved by state court order for some reason, he was entitled to compensation for his services and expenses, and the total of $585 was necessary and reasonable.

53. Thus, Hourigan was entitled to keep that $585 to satisfy what Mr. Carlson owed him for that necessary service that Debtor could not perform himself. This was for his own work, not a sharing of fees for Carlson's employment. But he took $1,500 for himself, and thus owed Carlson (and thus the Trustee) $915. As earlier noted (Finding 38), $700 of this excess was used to make the payments post-Chapter 7, so they need not be further dealt with; he must, however, turn back the $4,295 plus the $215 excess taken as a "fee," a total of $4,510.

54. Hourigan continued to make disbursements out of Debtor's fees from the Gonzalez case to the Debtor even after he knew the Debtor was a debtor in a Chapter 7 bankruptcy case, all without bankruptcy court approval. Hourigan thereby knowingly helped the Debtor conceal $4,510 constituting property of the bankruptcy estate after the conversion to Chapter 7 in order to keep it from the Debtor's Trustee and creditors. No

2. $58,000.00—$36,509.33 = $21,490.67.

3. $21,490.67—$19,333.33 = $2,157.34.

part of those funds were ever paid to the Trustee. He is obliged to turn over those funds to the estate even though he no longer has them. Since he knew about Carlson's bankruptcy filing, he must now turn over to the estate the amount of funds he received from the Gonzalez case after the bankruptcy was filed that was still retained by him after the Carlson bankruptcy was converted to Chapter 7. *Matter of USA Diversified Products, Inc.*, 100 F.3d 53, 56 (7th Cir.1996). Hourigan is therefore liable under 11 U.S.C. § 542(a) to return that $4,510 to the estate. Judgment will enter against him in that amount.

### *Brandt v. Loraine Carlson—Adversary No. 97 A 01153*

55. There were many payments made to Loraine Carlson, both before and after the filing of the Debtor's petition. They were deposited into Loraine's account, and she sometimes gave money to Carlson out of that account.

The payments to Loraine Carlson established by the evidence (totaling $15,950) fall into five categories:

56. *The Booth Checks ($2,000):* Loraine received at least two payments from Mr. Carlson pre-bankruptcy when he endorsed over to her the two checks from his client Steven Booth, one for $1,500 and one for $500, each within the ninety days preceding the filing of the petition. Trustee's Ex. 34 (copies are also attached to the Trustee's Complaint against Loraine Carlson, Ex. 48). As stated, these transfers constituted payments past due child support.

57. *DIP Payments to Loraine ($6,850):* Debtor made payments to Loraine out of his DIP account at Old Kent Bank. Debtor filed a final DIP report indicating that he paid a total of $6,950 for support and maintenance during the Chapter 11 period (Trustee's Exhibit 8; Debtor's Exhibit 15). The Debtor testified that he made all the payments shown, and that all went to Loraine Carlson. Debtor did testify that some part of one or more of those payments were for current obligations, but he was unable to specify how much was for current obligations. The evidence did not substantiate the Debtor's claim that such payments were for obligations com-ing due contemporaneously with the payments. Rather, it was established that he thereby paid past due obligations to Loraine. The source of funds used to make these post-bankruptcy payments were Debtor's fees from the Gonzalez case, some of which Hourigan paid over to the Debtor. *See* Debtor's Ex. 12. All those payments were therefore from property of the estate which, under § 542(a) of the Bankruptcy Code, should have been returned by Debtor or Loraine to the Trustee to the extent some remained when the bankruptcy converted to Chapter 7.

58. *Payments From Hourigan to Loraine ($2,500):* Hourigan made three postpetition payments during Debtor's Chapter 11 from Hourigan's "trust" account to Loraine, one for $1,000, another for $1,000, and a third for $500 (Trustee's Exhibit 40, pp. 372, 374, and 376). Defendants argued that those payments were for services rendered by Loraine Carlson, and therefore need not be returned to the estate. The testimony that Loraine Carlson ever worked for William Hourigan at any time was not corroborated by employee records, records of tax withholdings, or the like. However, at his deposition, Hourigan gave a very credible and coherent explanation of why he made the three payments to Loraine Carlson. *See* Trustee's Ex. 45, pp. 435–37 (Hourigan deposition transcript). He testified that in each instance he made a payment to Loraine Carlson he believed he owed Mr. Carlson the money, that Mr. Carlson told him he owed Loraine Carlson support or maintenance, and that Carlson told him to make the payment to Loraine. That is why he made each payment that went to Loraine. Hourigan did not testify at his deposition about Loraine ever having worked for him or that any of the payments were for services rendered to him by Loraine.

59. Similarly, in her answer to the Trustee's Complaint, Loraine Carlson stated the payments she received were for "nondischargeable maintenance." *See* Trustee's Ex. 49. She never mentioned anywhere in her answer that any of the payments were for services rendered by her to Hourigan or anyone else.

60. Testimony was offered at trial that Loraine worked for Hourigan, for which services the payments were compensation. However, that stands in stark contrast to both Hourigan's and Loraine Carlson's previous sworn statements and is not credible. The story that payments to Loraine Carlson were for services rendered appears to have been manufactured at trial.

61. Even if Loraine had worked for Hourigan, the evidence clearly shows that he paid her with property of the estate—the fees due the Debtor pre-petition from the Gonzalez case—for services not rendered to the estate and for which payments the bankruptcy estate received no benefit. Hourigan's bank statements, checks, and ledger (Trustee's Exhibits 43 and 40; Debtor's Exhibit 12) make clear that the only money that Hourigan had deposited into his so-called "trust" account at the times he made the three payments to Loraine was from proceeds of the Gonzalez settlement. It would therefore have been no defense to recovery of the monies by the estate from Hourigan that his payments to Loraine Carlson were for services Loraine allegedly rendered to Hourigan.

62. *Five Gonzalez Checks Endorsed By Debtor to Loraine ($4,200):* Hourigan wrote five checks payable to the Debtor, which the Debtor then endorsed and delivered to Loraine. Trustee's Ex. 40, pp. 372–380. The amounts of the five checks totaled $4,200. In each instance, the source of the funds was the Gonzalez settlement—property of the estate—and all those funds should have been paid to the Trustee. Loraine Carlson testified during direct examination by Dennis Carlson during the defendants' case that each of these payments were for maintenance or support allegedly due her, and that was found to be so. *See* Discussion p. 649.

63. *Meyer Checks ($400):* Fifth, Carlson made a post-petition transfer to Loraine in August and September of 1996 during the Chapter 7 phase of two $200 checks that he received from his client Jerry Meyer. Trustee's Ex. 35. As discussed, Debtor rendered all legal services in question prior to the commencement of his bankruptcy case. *See* Discussion, pp. 649–650.

### COUNT I— § 542(a)
### *Turnover and Accounting*

64. In Count I of his Complaint against Loraine Carlson, the Trustee requested an accounting from her and turnover of monies pursuant to § 542(a) of the Bankruptcy Code. Section 542 of the Bankruptcy Code provides in part as follows:

(a) ... an entity ... in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title ... shall deliver to the trustee, and account for, such property or the value of such property....

$\cdot$    $\cdot$    $\cdot$    $\cdot$    $\cdot$

(b) ... after notice and a hearing, the court may order ... [any] person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee.

65. All payments received by Loraine after Debtor filed in bankruptcy were from monies that came originally from property of the bankruptcy estate.

66. The amounts due Debtor of $19,333.33 for fees and $2,157.34 for expenses for the Gonzalez settlement constituted property of the underlying bankruptcy estate within the meaning of § 541(a) of the Bankruptcy Code. *See In re Carlson,* 211 B.R. 275 (Bankr.N.D.Ill.1997), and cases cited.

67. The Meyer checks were for legal services the Debtor rendered prebankruptcy, and Debtor should not have endorsed and delivered those checks to Loraine. Rather, Debtor should have turned them over to the Chapter 7 Trustee as the Meyer checks constitute property of the underlying bankruptcy estate within the meaning of § 541(a) of the Bankruptcy Code.

68. Loraine disclosed all information and records she preserved relating to those payments and the request that she account under § 542(c) was complied with in discovery.

No further relief of that sort is required or warranted.

69. However, pursuant to § 542(a) of the Bankruptcy Code, even as an indirect recipient, Loraine is liable under § 542(a) to turn over any amount of monies that she received out of estate property belonging to the Trustee in a Chapter 7 case. *Matter of USA Diversified Products, Inc.,* 100 F.3d 53 (7th Cir.1996). Of the foregoing payments to her, most came before conversion to Chapter 7 and were paid in Debtor's regular course of his obligations to her. To the extent, however, that she received more of Carlson's fees after conversion to Chapter 7, she must repay same to the Chapter 7 Trustee, even if she no longer has them. *Id.*

70. Thus, Loraine is liable to the extent she still retained and received Carlson's fees after Debtor converted his case to Chapter 7. The Trustee will be invited to specify exhibits showing these amounts when proposing a judgment order.

### COUNT II— § 547

### Avoidance of preferential transfers

71. Section 547(b) of the Bankruptcy Code provides:

§ 547. Preferences.

. . . . .

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property-

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made-

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if-

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

72. Section 547(f) of the Bankruptcy Code provides:

(f) For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.

73. Mr. Carlson transferred the Booth checks to Loraine prior to the bankruptcy filing. Those transfers occurred within one year before the Debtor filed his bankruptcy petition, but were made pursuant to a legal obligation on Mr. Carlson's part, namely the divorce decree between Debtor and Loraine Carlson (Trustee's Ex. 50). Under that decree, Debtor's support and maintenance obligations expired on 12/7/95 (*see* Ex. 50, pp. 512, 514, 515), but the unrebutted testimony showed that when the bankruptcy was filed he still owed her back due support for their daughter. Loraine Carlson was unable in her testimony to state specifically how much money she believed Mr. Carlson owed her at any time for such past due support, and she admitted keeping no records of payments received on account of such obligation. However, that support was due under their decree of marriage dissolution, and the Trustee did not show that none was due. As earlier established, given Debtor's deteriorating financial condition over time, it is quite unlikely that he kept up all his payments due to Loraine. The payments to Loraine were therefore not avoidable transfers by reason of 11 U.S.C. § 547(c)(7).

74. To the extent that Debtor's payments to Loraine within the 90 days preceding the commencement of the underlying case to Loraine Carlson of the $2,000.00 in payments he received from Steven J. Booth might constitute preferences within the meaning of

§ 547(b) of the Bankruptcy Code, such transfers could ordinarily be avoided and the recipient ordered to repay such amounts to the Trustee. However, since those payments were delivered to Loraine for past due maintenance and support, the Trustee may not recover those support payments by reason of § 547(c)(7). Trustee's case under Count II must therefore fail.

### COUNT III— § 549

### Avoidance of Post–Petition Transfers

75. Under 11 U.S.C. § 549(a), a Chapter 7 trustee may avoid any transaction occurring after bankruptcy is filed that is not authorized by the Bankruptcy Code or court order. Payments to Lorraine pre-bankruptcy cannot be reached under the provision, but she did receive a number of payments post-bankruptcy during the Chapter 11 phase. It was earlier found and concluded that some of those payments were authorized under the Code as ordinary and regular payments by the Debtor Carlson during the Chapter 11 phase.

76. However, neither the Court Order nor the Bankruptcy Code authorized any payments to her after conversion to Chapter 7. Judgment will enter for Plaintiff in Count III for the total of payments to Loraine after the conversion date.

### CONCLUSION

Pursuant to the foregoing Findings and Conclusions, counsel for the Trustee will by separate order be required to submit final judgment orders in accord therewith.