In the
United States Court of Appeals
For the Seventh Circuit

No. 01-3007

Union Planters Bank, N.A.,

Plaintiff-Appellee,

v.

John T. Connors and Mary L. Connors,

Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 01-C-10-MJR--Michael J. Reagan, Judge.

Argued February 21, 2002--Decided March 21, 2002

   Before Flaum, Chief Judge, and Harlington
Wood, Jr., and Williams, Circuit Judges.

   Flaum, Chief Judge.  John and Mary
Connors filed for bankruptcy under
Chapter 7 of the U.S. Bankruptcy Code
listing aggregate debts of over $19
million--more than $12 million of which
they owed to Union Planters Bank ("UPB").
On October 5, 2000, the bankruptcy court
granted UPB's objection to discharge,
holding that the debtors failed to keep
adequate records as required by 11 U.S.C.
sec.727(a)(3). On June 28, 2001, the
district court affirmed the denial of
discharge. The Connors now appeal.
Because we agree with the bankruptcy and
district courts that the records provided
were inadequate to allow UPB to ascertain
the Connors' financial condition or
business transactions, we affirm.

I.  Background

   In 1994, the Connors took out two lines
of credit with Magna Bank (now UPB) in
Belleville, Illinois, with a limit of $19
million. Over the course of the next
thirteen months, the Connors borrowed an
additional $9,002,116.10 from UPB,
bringing the approximate total to $28
million. These loans were secured with
2.5 million shares of stock in Agrosy
Gaming Corporation, a casino boat
partially owned by John Connors before it

became a publicly traded company. At its highest, the stock traded at over $36 per share. Because UPB believed that the lines of credit were more than adequately secured, it neither inquired as to how the money was to be used nor placed any restrictions on its application. When the Connors needed money, they would call a UPB officer who would release the requested funds into a personal checking account, wire them directly to one of the Connors' projects, or apply them to pay off outstanding loans. By 1997, the value of the Agrosy stock had fallen to under $3 per share. After selling the stock, UPB obtained a lien on almost all of the Connors' property and demanded repayment of all outstanding loans--approximately $12 million.

The Connors used the large sums of money they borrowed from UPB, as well as that borrowed from two other banks and four individuals, to fund four major ventures: the building of a home in Belleville that cost $4 million; the building of the Kings Point Racquet & Fitness Club, a tennis facility also located in Belleville that cost in excess of $10 million; the purchase of the Alystra, a casino in Las Vegas, Nevada; and the purchase of Crapper Jacks, a casino in Cripple Creek, Colorado. None of these projects was successful. The casinos lost money, and the Connors' plans to sell Crapper Jacks and develop the Alystra property fell through. They both closed due to lack of funds. The tennis club similarly failed to achieve an operating gain. At trial, John Connors testified that he did not recall why he obtained each of the loans specifically, or where the proceeds from each went. Money was shifted among the various ventures in an attempt to keep each above water.

The Connors admittedly did not keep many records of their financial transactions, most of which were handled through their checking accounts at UPB and at West Pointe Bank & Trust. They concede that they disposed of financial records when they moved from their home. They did,however, provide the bankruptcy court with bank statements that recorded deposits and withdrawals to and from their various checking accounts, and cancelled checks. They also provided balance sheets and other income statements of Kings Point. These

documents will be further described below, as necessary.

In the four years preceding their bankruptcy, over $16 million of check and other debit activity flowed from the Connors' checking accounts. During the year before the filing, however, the sum equaled only about $5,000. The Kings Point records indicate that they ate some of their meals there, and that the racquet club repaid the Connors a portion of its debt.

## II.  Discussion

The bankruptcy court denied discharge of debt, pursuant to 11 U.S.C. sec.727(a)(3) which provides that a court may deny such relief if:

The debtor has concealed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case . . . .

The provision requires that debtors produce records that provide "enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." In re Martin, 141 B.R. 986, 995 (N.D. Ill. 1992). The bankruptcy court held, and the district court affirmed, that the Connors did not provide a satisfactory record or accounting for their financial condition immediately prior to declaring bankruptcy, or the nature of their business transactions as required by sec.727(a)(3) and Seventh Circuit precedent. We review the courts' legal interpretations de novo; however, we review the bankruptcy court's findings of fact for clear error only. In re Scott, 172 F.3d 959, 966 (7th Cir. 1999). Where both the relevant law and the specific facts are clear, and the job of the bankruptcy court was to apply the law to the facts in the case, we reverse that court's conclusion only if clearly erroneous. In re Rovell, 194 F.3d 867 (7th Cir. 1999); Cook v. City of Chicago, 192 F.3d 693, 696 (7th Cir. 1999).

The Connors contend that the cancelled checks and deposit account statements that they provided to the court, along with the Kings Point financial records, adequately account for their financial transactions and condition for the several years prior to filing for bankruptcy. For example,/1 they purport to show that the use of the $225,000 loan from John's brother is easily traced. The West Pointe bank statement dated 7/23/97, they proclaim, shows that the Connors had an overdrawn balance on their priorstatement and that the full loan proceeds were deposited on 6/30/97. The July, August, and September bank statements also show nearly 100 checks and debits depleting the account, and no additional deposits. Therefore, they contend, it is easy to see from these records exactly where the loan proceeds went. Checks or debits were dispersed to Caesars Palace in Las Vegas to pay a gambling debt ($100,000), a law firm to pay for legal fees ($34,000), Mastercard, retail stores, utility companies, a country club, and West Pointe Bank. The additional loans--from banks and individuals-- the Connors claim, can be similarly traced.

The bankruptcy court found that the documents that the Connors produced did not meet the sec.727(a)(3) standard. First, this Circuit's case law makes clear that neither the court nor a creditor is required to reconstruct a debtor's financial situation by sifting through a morass of checks and bank statements. Scott, 172 F.3d at 970; In re Juzwiak, 89 F.3d 424, 428-29 (7th Cir. 1996). The Bankruptcy Code simply does not require UPB to match dates and amounts of deposits and withdrawals with dates and amounts of loans. It is the debtor's duty to maintain and provide the court with organized records of its financial dealings. Id. Moreover, the Connors conducted multiple large-scale transactions in the course of running their businesses. "Where debtors are sophisticated in business, and carry on a business involving significant assets, creditors have an expectation of greater and better record keeping." Scott, 172 F.3d at 970. There is no question that the Connors owned and invested in several major enterprises. They borrowed, lent, transferred, and spent extremely large

sums of money to keep these businesses afloat. Providing the court with a stack of cancelled checks and deposit account statements simply does not meet their burden under sec.727; it does not give UPB sufficient information to trace their financial history or to reconstruct their transactions. Id. at 969.

Also, the bankruptcy court held that even if the documents that they provided had been properly recorded and presented as a statement of their financial transactions, the picture would remain incomplete. After the funds that UPB, among others, lent to the Connors were initially spent, they were further shifted among the various business enter prises. Thus, even assuming that the documents presented to the bankruptcy court constituted a sufficient accounting of the transactions that they record, they do not allow UPB to reconstruct the business transactions between the Connors and their various enterprises.

The Connors argue that because they filed for personal bankruptcy, it is their disbursements that are critical--not those of the casinos or racquet club--and those are shown within the records produced. However, considering the significance of the business entities to the Connors' bankruptcy, as well as the intertwining of personal and business expenses, we find that the Connors' business transactions cannot be fully ascertained without further tracing of the loan proceeds. See id. at 970 ("[As the debtors] directly controlled both the flow of funds and the investment decisions of the business entities, we conclude that they should be held to a higher level of scrutiny than an ordinary debtor."). Moreover, at least one $500,000 loan--from the J.H. Berra Construction Company--is not documented at all. Several other personal loans were deposited into the Connors' checking accounts, but no record exists as to their purpose or terms. We do not find the court's conclusion to be clearly erroneous.

Furthermore, as the bankruptcy court reasonably found, the Connors failed to provide a complete record as to their personal financial status and living expenses during the two years preceding their declaration of bankruptcy. The

Connors argue that the bankruptcy court erred by ignoring the financial records of the Kings Point club during the pre-bankruptcy period. These records, as well as the testimony by the Kings Point general manager, purport to show that the club provided meals to the Connors, paid many of their utility bills, and signed checks directly to John Connors. Although these records do provide a piece to the puzzle, as the district court noted, they--along with the totality of the documents produced--do not present the entire picture. The Connors have no primary records of loan repayments received from their businesses. There is no way to know if the money and services that Kings Point provided were the Connors' sole source of income. In fact, John Connors's testimony during the hearing on UPB's motion for summary judgment indicates that it was not; they received additional loans from family members and friends. A recording of money given to the Connors from one entity is not adequate to show their living expenses; the Connors had the duty to keep records of all repayments and other moneys actually received. They failed to do so.

Finally, the Connors argue that even if grounds for denying their discharge of debt exist, the bankruptcy court abused its discretion by failing to weigh the equities of the case. We cannot agree. The debtors contend that because they would face such a sizable amount of debt in the absence of discharge--more than $15 million--and because there is no evidence of intent to defraud their creditors, the equities favor a discharge. It is true that "it remains within the discretion of a bankruptcy court to grant a discharge even when grounds for denial of discharge are demonstrated to exist." In re Hacker, 90 B.R. 994, 997 (W.D. Mo. 1987). Although the bankruptcy court likely would have been within its discretion to grant the discharge, weighing the vast amount of debt against the Connors' wrongdoing, see Hacker, 90 B.R. at 998, it found that the documents that the Connors were able to produce were grossly inadequate. Their failure to keep primary records, and the fact that they disposed of significant documents that they may have had, warranted a denial of discharge in the eyes of the bankruptcy court. We do not

find this to be an abuse of discretion.

III.  Conclusion

   Although the denial of discharge in bankruptcy "should be construed strictly against the creditor and liberally in favor of the debtor," such discharge is not a right, but a privilege. Juzwiak, 89 F.3d at 427. Moreover, intent to defraud is not a required element of a sec.727(a)(3) violation. Scott, 172 F.3d at 969; Juzwiak, 89 F.3d at 430. The conclusion of both the bankruptcy and district courts--that the Connors violated 11 U.S.C. sec.727(a)(3)--was not clearly erroneous. We AFFIRM.

FOOTNOTE

/1 An example is required here as we, like the creditors and courts below, decline to analyze each check and each bank statement produced to reconstruct the Connors' financial dealings.