In re Chris HANSEN, Debtor.

Joel A. Schechter, Trustee, Plaintiff,

v.

Chris Hansen, Defendant.

Bankruptcy No. 02 B 33776.
Adversary No. 03 A 2299.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

June 15, 2005.

Jeffrey Strange, Rod Radjenovich, Jeffrey Strange & Associates, Wilmette, IL, for Debtor.

Joel A. Schechter, Law Offices of Joel A. Schechter, Chicago, IL, for trustee.

## MEMORANDUM OPINION

A. BENJAMIN GOLDGAR,
Bankruptcy Judge.

In 2001, lawyer and businessman Chris Hansen sold his house. Over the next year and a half, he claims to have frittered away most of the money from the sale on the stock market. He purportedly blew another $100,000 trying to shore up the small, failing oil company where he worked. The rest went to what he called "living expenses." On the run from his ex-wife who was pressing him to make his delinquent child support payments, in September 2002 Hansen sought relief under chapter 7 of the Bankruptcy Code.

Joel Schechter was appointed trustee in the case. Schechter investigated Hansen's affairs for nine months and then filed an adversary complaint objecting to Hansen's discharge under several subsections of section 727(a), 11 U.S.C. § 727(a). On March 25, 2004, the court set the adversary proceeding for trial. Hansen responded by moving to convert his case to one under chapter 13. After an evidentiary hearing, the court denied his motion, finding him ineligible for chapter 13. *See In re Hansen,* 316 B.R. 505, 509–10 (Bankr.N.D.Ill. 2004).

The adversary proceeding ultimately went to trial on the trustee's complaint, which alleged four grounds for denying Hansen's discharge: (1) that he "concealed, destroyed, mutilated, falsified or failed to keep or preserve" records from which his financial condition might be ascertained, 11 U.S.C. § 727(a)(3); (2) that his misrepresentations and omissions in his petition and schedules constituted a "false oath," 11 U.S.C. § 727(a)(4)(A); (3) that he knowingly or fraudulently withheld from the trustee information relating to his property or financial affairs, 11 U.S.C. § 727(a)(4)(D); and (4) that he failed to explain satisfactorily a loss or deficiency of assets to meet his liabilities, 11 U.S.C. § 727(a)(5).

For the reasons that follow, the evidence at trial entitles Schechter to judgment on his claims under sections 727(a)(4)(A), 727(a)(3), and 727(a)(5). Hansen will be denied a discharge.[1]

---

1. The remaining claim under section 727(a)(4)(D) will be dismissed as moot. *See*

*In re Krehl,* 86 F.3d 737, 744 (7th Cir.1996) (noting that proof of a single ground under

## 1. Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the district court's Internal Operating Procedure 15(a). This is a core proceeding. 28 U.S.C. § 157(b)(2)(J).

## 2. Findings of Fact

### a. Hansen and His Employment

Hansen is a University of Michigan graduate who received a law degree from John Marshall Law School in 1978. (Tr. at 10; P.Ex. 9).[2] He was divorced in 1995 and has three children. (P.Ex. 9). Before 1995, Hansen appears to have practiced law full-time. (Tr. at 11). More recently, he has been involved with several small, mostly unsuccessful companies engaged in the compounding and blending of motor oil. (*Id.* at 24; Dep. Tr. at 14).

The first of these was a corporation called APMC at which Hansen held the position of vice president. (Tr. at 14). Around 2000 or 2001, however, APMC ran into financial trouble and plenty of litigation. (*Id.* at 17–18; Dep. Tr. at 14). Among the fifteen to twenty-five lawsuits filed against the company was an Illinois state court action that Harris Bank Barrington ("Harris Bank") commenced in October 2001 to foreclose mortgages on APMC's buildings, buildings securing obligations of $4.1 million. (D.Ex.3). Because he had personally guaranteed those obligations, Hansen was named as a defendant. (*Id.*). The action was pending when

Hansen filed his bankruptcy petition (Tr. at 90–91) and is still pending.

In 2002 or so, Hansen began working for another corporation, Alliance Petroleum ("Alliance"), again as vice president. (*Id.* at 16; Dep. Tr. at 12). During the time he worked there, however, Alliance made no money, and Hansen received no salary or benefits.[3] (Tr. at 14–15; Dep. Tr. at 6, 10). Sometime during 2004, Hansen became employed with still another oil company, American Petroleum ("American"), again as vice president. (Tr. at 11). Toward the end of 2004, Hansen began receiving a salary from American. (*Id.*).

All three companies for which Hansen worked, American, Alliance, and APMC, were related: they shared the same president (one Richard Stiefel), occupied the same premises, and were engaged in the same business. (*See id.* at 13, 15, 24; Dep. Tr. at 8–10). Despite his position as an officer, however, Hansen professed ignorance of the most basic corporate information. He was unable or unwilling, for example, to say when the companies were incorporated, began operating, or ceased operating (Tr. at 12 (American); Tr. at 13, Dep. Tr. at 7 (Alliance); Tr. at 14 (APMC)); who the shareholders were (Tr. at 12 (American); Dep. Tr. at 7–8 (Alliance)); or who the officers or directors were other than Stiefel and himself (Tr. at 12 (American); *id.* at 13 (Alliance); *id.* at 15 (APMC)). He claimed not to know Stiefel's address or telephone number (Dep. Tr. at 9) and was vague even about

---

section 727(a) is enough to justify a denial of the debtor's discharge).

**2.** The trial transcript is cited in this opinion as "Tr. ____." Hansen's deposition transcript (defendant's exhibit No. 18) is cited as "Dep. Tr. ____." Plaintiff's and defendant's exhibits are cited respectively as "P.Ex. ____" and "D. Ex. ____."

**3.** Why Hansen continued to work there for nothing was never adequately explained. At his deposition, he said simply, "I have no other job." (Dep. Tr. at 10). At trial, however, he said that he continued working for Alliance in hope that when the company "turned around" he would receive a salary. (Tr. at 23).

when he himself had worked for which company (Tr. at 11, 15–16; Dep. Tr. at 12).

### b. Hansen's Residences and the Gavin Court Sale

Hansen currently resides in Bannockburn, Illinois, moving there in January 2002, nine months before filing bankruptcy. (Tr. at 8). Hansen does not hold title to the Bannockburn property himself; the property is owned jointly by Hansen's mother, Virginia Gefvert, and Nancy Vedral, a woman with whom Hansen is involved. (Tr. at 43, 52; Dep. Tr. at 11, 49, 51).

Hansen had previously spent short stints in other Chicago suburbs, living on Church Road in Lake Forest for less than a year and in Highland Park for "a couple of months." (Tr. at 8–9). Before Highland Park, he lived on Gavin Court in Lake Forest in a house he owned jointly with Vedral. (*Id.* at 9). In June 2001, about a year before he filed bankruptcy, Hansen and Vedral sold the Gavin Court property for $1.3 million. (*Id.* at 38–39; P.Ex. 8). Of the $362,464 in net proceeds from the sale, Hansen received $270,469 and Vedral the other $91,995. (*Id.*).

### c. Hansen's Fidelity Account and the Missing $270,000

Hansen maintained a brokerage account with Fidelity Investments. Sometime in 2001, he deposited the entire $270,469 from the Gavin Court sale into the account. (Tr. at 83; Dep. Tr. at 48; P.Ex. 7; D. Ex. 10). Hansen then proceeded to invest heavily in technology stocks, even trading daily in those stocks on margin. (Tr. at 84, 88). His timing was unfortunate: as

he put it, this was "absolutely the top of the bubble that was about to burst." (*Id.* at 83). By December 31, 2002, the Fidelity account's balance had been reduced to $291.

Where the money went is unclear. The Fidelity tax statements for Hansen's account suggest trading losses of $152,756 in 2001 and $61,509 in 2002. (P. Exs. 4, 6; *see* Tr. at 87–88). The investment report from Fidelity, on the other hand, shows a net short-term loss of $272,421 in 2002. (P.Ex. 5). For reasons that were not explained, at trial Hansen ignored the $152,756 figure and instead combined the $272,421 figure from 2001 (which he mistakenly said was $267,000 (Tr. at 87–88)) with the $61,509 figure from 2002 to get a total loss of roughly $325,000.[4] (*Id.* at 84–88; *see also id.* at 96–97 (stating that his losses amounted to "$326,000")).

The 2001 and 2002 Fidelity investment reports also reflect $202,665 withdrawn from the account: $102,403 in 2001 and $100,262 in 2002. (P. Exs. 5, 7; *see also* Tr. at 36). Of those amounts, the 2001 report shows $70,000 in checking activity and $25,000 in "other withdrawals." (P.Ex. 5). (How the other $7,403 was withdrawn is not explained.) The 2002 report similarly shows $69,611.89 in checking activity and $30,650.29 in "other withdrawals." (P.Ex. 7).

According to Hansen, he made the withdrawals for two purposes. First, he said that near the end of 2001 he withdrew $100,000 from the Fidelity account and loaned the money to APMC.[5] (Tr. at 37, 84;

---

**4.** But not always. At his deposition, Hansen said that he "lost $275,000 in the stock market." (Dep. Tr. at 50).

**5.** In fact, the funds were loaned to an entity Stiefel owned called "5841 Building Corporation." (Dep. Tr. at 24–25), the idea being to keep the funds beyond Harris Bank's reach.

Hansen testified: "Mr. Stiefel was using the 5841 Building Corporation account as APMC's account because any money that would have been put in APMC's account would have been taken or liened against by Harris Bank, so he was operating APMC out of that account." (*Id.* at 24).

Dep. Tr. at 24, 26–28, 50). The $25,000 in "other withdrawals" shown on the 2001 investment report was (he claimed) a wire transfer for that purpose. (Tr. at 34). Hansen said that in fact no checks were written on the Fidelity account for the APMC loan; instead, the entire $100,000 was wired to Harris Bank, where he maintained a checking account, and checks were then written to APMC on the Harris account. (Dep. Tr. at 40–42; *see* D. Ex. 13).

The other $100,000, Hansen said, was withdrawn from the Fidelity account in 2002 to pay his "living expenses." (Tr. at 37, 84). Hansen did not elaborate on what these living expenses might have been or when or to whom they might have been paid, and his testimony on the subject as a whole was less than straightforward: he also said variously that his mother paid his living expenses (Dep. Tr. at 10–11), that his mother merely contributed to payment of his living expenses (Tr. at 37–38), and that Vedral paid part of his living expenses (Dep. Tr. at 12).

### d. Miscellaneous Hansen Financial Matters

Several other financial matters deserve mention.

1. At some point, Hansen borrowed $400,000 or $450,000 from his mother. (Tr. at 53; P.Ex. 1, Sched. F). Whether the loan was for living expenses or some other purpose was never clarified. The loan was evidenced by a promissory note. (Tr. at 43, 66; Dep. Tr. at 44).

2. At some point, Hansen had a certificate of deposit ("CD") with Harris Bank and used it to secure a $150,000 loan from Harris. (Tr. at 20). Apparently Hansen defaulted on the loan, because Harris seized the CD to pay off the loan balance in the summer of 2002. (*Id.*). Hansen claimed at trial that he never had a copy of the CD, that it was always in the bank's possession. (*Id.* at 43). At his deposition, however, he testified that he in fact once had a copy of the CD but no longer did. (Dep. Tr. at 44).

3. In a pre-hearing memorandum filed in June 2002 with the Illinois state court in his divorce case, Hansen listed as an asset 400 shares of Nextel stock. (P.Ex. 9). At trial, Hansen claimed not to recall ever owning any Nextel stock (Tr. at 40), but both the 2001 and 2002 Fidelity investment reports list several transactions involving Nextel stock (P. Exs.5, 7).

4. Hansen owned two oriental rugs he valued at "several thousand dollars each" that he said had been ruined in the summer of 2002 when the basement of the Bannockburn house flooded during a storm. (Tr. at 40–41). The damage rendered the rugs worthless. (*Id.* at 42). Hansen submitted a claim to his insurance carrier for the loss. (*Id.* at 41).

5. Hansen was the obligor on a student loan for his eldest son, a loan payable to the U.S. Department of Education. (*Id.* at 21; Dep. Tr. at 20; P.Ex. 1, Sched. F). In the June 2002 prehearing memorandum in the divorce case, he listed the loan balance as $100,000. (P.Ex. 9). At trial and at his deposition, however, Hansen said the balance as of September 2002 was actually somewhere in the region of $38,000 to $40,000. (Tr. at 21, 51–52; Dep. Tr. at 21).

6. Hansen filed a federal income tax return for 2000. (Tr. at 26; P.Ex. 2). On the 2000 return, he reported $89,725 in wages, as well as $3,023 in interest from the Harris account and $985 in dividends and interest from his Fidelity account. (*Id.*). Hansen also filed a federal income tax return for 2001. (Tr. at 27; P.Ex. 3). On the 2001 return, he reported $30,000 in wages and $3,064 in interest from an unnamed source. (*Id.*). There is no dispute

that Hansen earned income during 2000 and 2001. (*See* D. Ex. 19 at 2).

Whether Hansen filed a return for 2002, on the other hand, is unclear: at his deposition he testified that he had (Dep. Tr. at 12–13), that he had not (*id.* at 42), and that he could not remember (*id.*). He maintained without contradiction, however, that he had no income after March 2001. (Tr. at 91).

7. Under his divorce judgment and settlement, Hansen was obligated to pay his ex-wife $3,000 per month in maintenance and child support. (*Id.* at 91; Dep. Tr. at 20–21). He was also obligated to make monthly payments of $1,000 for her mortgage (Tr. at 91; *but see* Dep. Tr. at 20 ("$800 a month")), and $400 for his children's medical insurance (Tr. at 91). The June 2002 prehearing memorandum in the divorce action was filed in support of a motion to modify the judgment and settlement, presumably to reduce the amount of his payments. (*See* P.Ex. 9).

### e. Hansen's Petition and Schedules

Hansen's effort in the circuit court to have his payments reduced evidently proved unsuccessful, because his ex-wife moved to have him held in contempt for failing to pay child support. (Tr. at 94). Her motion was scheduled to be heard September 5, 2002. (*Id.* at 94). Concerned about a contempt citation (to say nothing of possible jail time), and facing Harris Bank's summary judgment motion in the foreclosure action (*id.* at 90–91, 94), Hansen filed a petition for relief under chapter 7 on September 4, 2002 (*see* P.Ex. 1). His schedules were filed with the petition. (*Id.*).

Although the petition and schedules were prepared with the assistance of counsel (Tr. at 95; *see* P.Ex. 1 at 2), they contained a large number of errors and omissions:

a. On Schedule B, Hansen listed as personal property the CD securing the Harris loan, stating that the CD was in his possession. (P.Ex. 1, Sched. B at 1). In fact, the CD was no longer an asset by the time Hansen filed his petition (Tr. at 20), and he testified at trial that he never had a copy of the CD (*id.* at 43).

b. Schedule B required Hansen to disclose "financial accounts . . . in . . . brokerage houses." (P.Ex. 1, Sched.B). Hansen failed to list the Fidelity account, although he still had an interest in that account when he filed his petition. (Tr. at 20).

c. Schedule B called for a listing of "household goods and furnishings," as well as a listing of "art objects." Hansen listed only books, failing to mention his two oriental rugs. (P.Ex. 1, Sched. B at 1; *see* Tr. at 41–42). Hansen's statement of financial affairs ("SOFA") required him to list "all losses from fire, theft, other casualty or gambling." (P.Ex. 1, SOFA at 3). Hansen checked "none" (*id.*), although Hansen said the rugs had been ruined in a flood earlier that summer, and he had filed an insurance claim (Tr. at 41).

d. Schedule B required Hansen to list "stock and interests in incorporated and unincorporated businesses." (P.Ex. 1, Sched. B at 2). Hansen checked "none." (*Id.*). In fact, according to the pre-hearing memorandum he filed three months earlier in his divorce case, he owned 400 shares of Nextel stock. (P.Ex. 9).

e. On Schedule F, Hansen listed the balance of his son's student loan as $100,000 (P.Ex. 1, Sched. F at 2), the same figure he used in the divorce case (P.Ex. 9). In fact, Hansen admitted, the balance was between $38,000 and $40,000. (Tr. at 21, 51–52; Dep. Tr. at 21).

f. On Schedule J, Hansen gave "$0.00" as his current expenditure for "alimony, maintenance, and support paid to others."

(P.Ex. 1, Sched.J). He also gave "$0.00" as "payments for support of additional dependents not living at your home." (*Id.; see also* Tr. at 105). In fact, Hansen was paying monthly—or should have been paying monthly—$3,000 in maintenance and child support, $1,000 for his ex-wife's mortgage payments, $400 for his children's medical insurance, and $1,000 on the student loan. (Tr. at 91; Dep. Tr. at 20). These obligations were omitted although Hansen asserted they were a principal reason he filed bankruptcy. (Tr. 91, 94).

g. Hansen's SOFA required him to report prior addresses if he had moved in the two years before filing bankruptcy. (P.Ex. 1, SOFA at 3). Hansen checked "none" (*id.*), although he had at least three prior addresses during that time, two in Lake Forest and one in Highland Park. (Tr. at 8–9).

h. The SOFA demanded information about businesses in which Hansen had been a corporate officer during the preceding six years, including the nature of the businesses, their names, addresses, taxpayer identification numbers, and beginning and ending dates. (P.Ex. 1, SOFA at 4). Hansen checked "none" (*id.*), although during that period he had served as vice president both of APMC and of Alliance, and was still serving as vice president of Alliance (albeit without pay) when he filed his petition. (Tr. at 14, 16).

i. The SOFA required Hansen to state his gross income from employment during the two years immediately preceding the calendar year in which the case was filed. (P.Ex. 1, SOFA at 1). In Hansen's case, that meant reporting income for the years 2001 and 2000. Hansen checked "none," although he had income from his employment during both years. (Tr. at 26–27; P. Exs. 2, 3; D. Ex. 19 at 2). His income in 2000 was almost $90,000. (Tr. at 26; P.Ex. 2).

j. The very next SOFA question asked about income other than from employment during the two years before the bankruptcy. (P.Ex. 1, SOFA at 1). Again, Hansen checked "none." (*Id.*). On his tax returns, however, he reported dividend and interest income for 2000 and interest income for 2001. (Tr. at 26–27; P. Exs. 2, 3).

k. The SOFA required a list from Hansen of all property transferred outside the ordinary course of his business or financial affairs within a year of the bankruptcy. (P.Ex. 1, SOFA at 3). Hansen checked "none," declining to reveal the $100,000 he says he loaned APMC at the end of 2001. (Tr. at 37, 84; Dep. Tr. at 24, 26–28, 50).

l. The SOFA sought a list of all suits and administrative proceedings to which Hansen was a party in the year preceding the bankruptcy. (P.Ex. 1, SOFA at 2). In response, Hansen disclosed his divorce case, but he omitted the Harris Bank foreclosure action (*id.;* Tr. at 106) in which he was potentially liable for more than $4 million (D.Ex.3). Hansen managed to overlook the foreclosure action although, like his obligations to his ex-wife and children, the action was allegedly one of the forces driving his decision to seek bankruptcy protection. (Tr. at 90).

Despite these errors, on September 3, 2002, Hansen signed the petition and schedules, declaring under penalty that he had read the schedules and that the information in them was "true and correct." (P.Ex. 1 at 2, Declaration Concerning Debtor's Schedules; Tr. at 19). He made the same declaration about the information in the SOFA. (P.Ex. 1, SOFA at 5; Tr. at 19). These declarations were false. Hansen may or may not have read the schedules and SOFA (he never said), but information in them was not true and correct. Nor were the schedules and SOFA ever

amended to rectify the problems. (Tr. at 19, 107).

Hansen tried to explain away a few of the deficiencies. Harris seized the CD, he said, "almost in conjunction with" the bankruptcy, and the CD appeared in Hansen's schedules (even though he no longer owned it) to "put the trustee on notice that there was an asset that he might want to look at." (*Id.* at 98). The missing interest and dividend income was so minimal that he did not consider it income (Dep. Tr. at 47), and he termed its omission an "oversight" (Tr. at 96). The oriental rugs were not listed because the flood had rendered them "worthless." (*Id.* at 41–42). The Nextel stock Hansen said he did not even recall having owned. (*Id.* at 40). And the prior addresses he simply "missed" when he reviewed the schedules before signing them. (Dep. Tr. at 35).

Mostly, though, Hansen attributed the errors and omissions in the schedules and SOFA to the "hurried, frenzied state" in which everything was filed. (Tr. at 96). He had "a matter of hours" to stop the state court contempt proceedings, he said, and he was "literally giving answers over the telephone" to his lawyer as he was driving to the lawyer's suburban office to get the petition, copy it, and take it to Chicago to be filed. (*Id.* at 95). "I came up with the answers all off the top of my head," he admitted. (*Id.*). "I did not review any of my financial documents in reference to coming up with the answers." (*Id.*). Given his "distressed . . . mental state," Hansen said, the resulting errors were entirely innocent. (*Id.* at 94–95).

Once the bankruptcy halted both the contempt proceeding and the Harris fore-closure action, there was time to amend the schedules and SOFA. Hansen, however, never amended them. (*Id.* at 104, 107; Dep. Tr. at 6). In fact, more than three years after the bankruptcy began, the original, error-ridden schedules and SOFA still had not been amended. (Tr. at 104). This seems to have been a conscious decision: Hansen said his lawyer told him there was "a case called *Bailey* " making it "irrelevant whether you amended them or not." (*Id.* at 107).

### f. Hansen's Records

On January 9, 2003, Schechter convened the meeting of creditors. (*Id.* at 50, 79). At the meeting, Hansen produced records relating to his financial condition and affairs, and at trial he insisted that his production was voluminous: he asserted that he brought "three briefcases of documents" to the meeting, enough to fill "a box 10 × 12." (*Id.* at 79). Despite this allegedly voluminous production, over the next several months Schechter found it necessary to ask Hansen repeatedly for additional records. (*See* D. Ex. 17).

Some records, however, were never produced, and it appears Hansen had either failed to retain them or had not maintained them in the first place. Hansen did not retain complete and accurate copies of his 2000 and 2001 tax returns. The 2000 return produced to Schechter had no .W–2 attached. (Tr. at 27; *see* P.Ex. 2). The 2001 return lacked a Schedule B. (Tr. at 28; *see* P.Ex. 3). Hansen did not keep copies of the checks he wrote on his Fidelity account (Tr. at 38), and he maintained no records whatever of withdrawals from the account, whether by wire transfer or by check (Dep. Tr. at 41).[6] Hansen did

---

**6.** Only the monthly statements would have shown the dates and amounts of withdrawals, Hansen admitted (Dep. Tr. at 41), and the statements were lost in the same basement flood that destroyed the oriental rugs, as well as in another flood at an earlier address. (Tr. at 29–30). Hansen investigated the possibility of procuring duplicates from Fidelity but decided the cost was prohibitive. (*Id.* at 31).

not produce and presumably did not keep a copy of the Harris CD. (Tr. at 43, 55). He did not produce and presumably did not keep a copy of the promissory note to his mother (*id.* at 55), although he testified at his deposition that he had one (Dep. Tr. at 44).

Finally, Hansen was unable to produce and apparently did not retain the majority of the statements and canceled checks from his Harris Bank checking account. Schechter requested statements and canceled checks from August 1, 2001 through September 30, 2002, the period covering roughly the year before Hansen filed the bankruptcy. (Tr. 44–45, 54–55). In response, Hansen mustered only four monthly statements from that fourteen-month period, statements listing just sixteen checks. (*See* D. Ex. 4). Hansen produced 130 checks, but only thirty-one of them were from the relevant period. (*See* D. Ex. 5). He said that these were all the records he had and conceded his records were not complete. (Tr. at 100–01). Schechter was less euphemistic in his assessment, calling Hansen's bank records "very minimal." (*Id.* at 54).

### 3. Conclusions of Law

■ Section 727(a) denies a discharge to a debtor who has been unscrupulous in certain ways. The bankruptcy system is designed to aid the "honest but unfortunate debtor." *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (internal quotation omitted). No discharge is available, consequently, to the debtor who has been "less than honest." *Village of San Jose v. McWilliams,* 284 F.3d 785, 790 (7th Cir.2002). Although the denial of a discharge is a "drastic" remedy, *Stathopoulos v. Bostrom (In re Bostrom),* 286 B.R. 352, 359 (Bankr.N.D.Ill.2002), a discharge in bankruptcy is a privilege, not a right, *Peterson v. Scott (In re Scott),* 172 F.3d 959, 966 (7th Cir.1999); *In re Juzw-*

*iak,* 89 F.3d 424, 427 (7th Cir.1996). A debtor who has not been honest and forthcoming—particularly in connection with the bankruptcy itself—does not deserve that privilege. *Juzwiak,* 89 F.3d at 427.

In this case, Schechter, the chapter 7 trustee, contends that Hansen should be denied his discharge under sections 727(a)(3), 727(a)(4)(A), and 727(a)(5). Schechter proved each of these grounds for the denial of discharge by a preponderance of the evidence.

#### a. Section 727(a)(4)(A)

■ Schechter easily demonstrated, first of all, that Hansen should be denied a discharge under section 727(a)(4)(A).

■ To receive a "fresh start" under the Bankruptcy Code, a debtor must present full and accurate information about himself and his affairs. *Bostrom,* 286 B.R. at 359. All assets and ownership interests must be disclosed, and all questions in the schedules and statement of financial affairs must be answered completely and honestly. The trustee and creditors are entitled to information that will allow them to evaluate the case and administer the estate's property. *Clean Cut Tree Serv., Inc. v. Costello (In re Costello),* 299 B.R. 882, 899 (Bankr.N.D.Ill.2003). Indeed, "[t]he very integrity of the bankruptcy court and the successful administration of the bankruptcy system rest upon compliance with the debtor's obligation of disclosure." *Urological Group, Ltd. v. Petersen (In re Petersen),* 296 B.R. 766, 790 (Bankr.C.D.Ill. 2003). Complete and honest disclosure is therefore "a condition precedent to the privilege of discharge." *Glucona Am., Inc. v. Ardisson (In re Ardisson),* 272 B.R. 346, 359 (Bankr.N.D.Ill.2001).

■ Section 727(a)(4)(A) enforces this "paramount and absolute" duty, *Petersen,* 296 B.R. at 790, by denying a discharge to a debtor who has "knowingly and fraudu-

lently, in or in connection with the case ... made a false oath or account." 11 U.S.C. § 727(a)(4)(A). To prevail under section 727(a)(4)(A), an objecting party must establish that (1) the debtor made a statement under oath; (2) the statement was material to the bankruptcy case; (3) the statement was false; (4) the debtor knew the statement was false; and (5) the statement was made with an intent to deceive. *Cohen v. Olbur (In re Olbur),* 314 B.R. 732, 745 (Bankr.N.D.Ill.2004); *Costello,* 299 B.R. at 899; *Bostrom,* 286 B.R. at 359; *Neugebauer v. Senese (In re Senese),* 245 B.R. 565, 574 (Bankr.N.D.Ill.2000).

The evidence at trial established each of these elements. First, Hansen made statements under oath because all debtors swear to the accuracy of their petitions and schedules. *See Olbur,* 314 B.R. at 745; *Costello,* 299 B.R. at 899. Second, all of the statements Hansen made in his petition and schedules relating to his assets, property, and financial affairs were material to the bankruptcy. *Olbur,* 314 B.R. at 745; *Netherton v. Baker (In re Baker),* 205 B.R. 125, 133 (Bankr.N.D.Ill.1997); *Costello,* 299 B.R. at 900.

Third, many of these statements were false. Indeed, Hansen's schedules were riddled with misstatements and omissions. Hansen listed the Harris CD as personal property on Schedule B and asserted that the CD was in his possession, although the CD was no longer an asset and he no longer held it. On Schedule B, Hansen failed to list the Fidelity account under "accounts," although the account was still open; failed to list his oriental rugs either as "household goods and furnishings" or as "art objects"; falsely checked "none" in response to the question about "all losses," although the rugs had been destroyed; and falsely checked "none" in response to the question about "stock," although he owned 400 shares of Nextel stock. On Schedule F, Hansen inflated the balance of his son's student loan to $100,000, when the balance was less than half that. On Schedule J, Hansen listed no expenditures for maintenance and support and no expenditures for support of dependents not living with him, when his payments for maintenance, child support, insurance and the student loan totaled roughly $5,400 per month.

█ The trail of falsehoods continued on Hansen's SOFA. Hansen falsely stated that he had no prior addresses in the two years before the bankruptcy when there had been three. He falsely stated that he had not served as a corporate officer during the six years before the bankruptcy. He falsely stated both that he had no income from employment in 2000 and 2001 and that he had no income other than from employment during those years. He falsely stated that he had transferred no property outside the ordinary course of his business or financial affairs in the year before the bankruptcy, neglecting to mention the $100,000 loan to APMC. And somehow he failed to list the $4 million Harris Bank foreclosure action as a suit to which he was a party.[7]

---

**7.** On the other hand, Hansen told the truth when he listed no employment on Schedule I and maintained at trial that he was unemployed in 2002 when he filed his petition. (P.Ex. 1, Sched. I; Tr. at 97). Hansen was an officer of a corporation and was going to work there daily, but he never received a salary. (Tr. at 97). Although courts disagree, most appear to hold that someone who is not paid is not employed. *See, e.g., York v. Association of Bar of N.Y.,* 286 F.3d 122, 125–26 (2nd Cir.2002) (holding that unpaid person is not an "employee" under Title VII); *see also Madonia v. Blue Cross & Blue Shield of Va.,* 11 F.3d 444, 449 (4th Cir.1993) (holding person an "employee" under ERISA in part because she "dr[ew] a salary"); *Wolverine Ins. Co. v. Jockish,* 83 Ill.App.3d 411, 416, 38

Fourth, Hansen knew these statements were false and made them with a fraudulent intent. For a debtor to possess the requisite intent, either he must have knowingly intended to defraud, or he must have "engaged in such reckless behavior as to justify the finding of fraud." *In re Yonikus*, 974 F.2d 901, 905 (7th Cir.1992). Sometimes described as "reckless indifference," *see, e.g., Senese*, 245 B.R. at 575, reckless disregard consists of simply "not caring whether some representation is true or false," *In re Chavin*, 150 F.3d 726, 728 (7th Cir.1998); *see also Yonikus*, 974 F.2d at 905 (holding that fraudulent intent will be inferred when "the debtor acted so recklessly ... that fraud is implied"). Because direct evidence of intent is rarely available, moreover, intent may be inferred from circumstantial evidence, including the debtor's conduct and the petition and schedules themselves. *Costello*, 299 B.R. at 900; *Senese*, 245 B.R. at 575.

No reasonable person could doubt that in completing his schedules and SOFA Hansen was utterly indifferent to the truth. Hansen is an intelligent and educated businessman, a lawyer, and a corporate officer sophisticated in financial matters. He surely recognized both the importance of supplying accurate information and the significance of attesting under oath to that information's accuracy. *See Chavin*, 150 F.3d at 729 (upholding denial of discharge where debtor was "a mature and experienced businessman"); *Olbur*, 314 B.R. at 746 (inferring intent where debtor was a "well-educated businessman ... acquainted with financial matters"); *Bostrom*, 286 B.R. at 362 (inferring intent where debtors were "intelligent, experienced and articulate business people who knew their personal and business situation"). Nevertheless, Hansen filed papers rife with errors—and not the kind that might be written off as inadvertent or careless, either, but errors on fundamental matters: where he had lived, where he worked, how much money he made, what he owned. *See Lini, Inc. v. Schachter (In re Schachter)*, 214 B.R. 767, 773 (Bankr.E.D.Pa.1997) (noting that "pervasive and immense errors" support an inference of fraudulent intent). That Hansen did nothing to correct these errors lends additional weight to the conclusion that he had no interest in full and honest disclosure.[8] *See Olbur*, 314 B.R. at 746.

Ill.Dec. 686, 403 N.E.2d 1290, 1294 (3rd Dist. 1980) (finding it "generally recognized that a true employer-employee relationship does not exist in the absence of the payment or expected payment of consideration in some form by employer to employee") (internal quotation omitted); *Hoebel v. Travelers Ins. Co.*, 275 Ill.App. 551, 564, 1934 WL 2897 (1st Dist. 1934) (defining "employee" as "a person working for a salary or wage") (internal quotation omitted); *but see Bertino v. Equitable Fire & Marine Ins. Co.*, 214 N.Y.S.2d 155, 157 (Sup.Ct.1961) (stating that a "master-servant relationship does not turn upon the payment of wages"). This comports with the dictionary definition of "employee" as "a person who works for another in return for financial or other compensation." *American Heritage Dictionary* 604 (3rd ed.1996).

8. So does Hansen's trial testimony generally. His answers were typically curt, as if he were trying to avoid giving up too much, and often they were simply unbelievable. He repeatedly responded "I don't know," for example, to questions calling for basic information—where he had lived and when, who were the officers, directors, and shareholders at companies where he himself had been an officer, and so on—information an average person could reasonably be expected to know. More than once he contradicted himself. In all, Hansen's cavalier testimony—and the arrogant, disdainful manner in which he delivered it—left the definite impression that he considered the adversary proceeding (if not the entire bankruptcy) a mere nuisance, unworthy of his attention. Hansen certainly viewed the trustee as little better than a pest, declaring that in trying to extract information and rec-

Hansen had no legitimate justification for the sad state of his schedules and SOFA. He insisted they were full of errors because he had to fill them out and file them on the fly: with only hours to halt the state court contempt proceedings, he said, he was forced to come up with information off the top of his head. But even the most urgent and desperate need for bankruptcy protection cannot excuse falsehoods in a debtor's filings. "Most debtors who seek bankruptcy protection have creditors pounding on the door and must act quickly. They are obligated to provide a complete and accurate account of their property and financial affairs for all that." [9] *Id.* at 747; *see also Henkel v. Green (In re Green)*, 268 B.R. 628, 648 (Bankr.M.D.Fla.2001). Had Hansen had any real interest in accurate disclosures, moreover, he would have amended his schedules and SOFA once the stay gave him the chance. He never bothered. *See Olbur*, 314 B.R. at 747 n. 9; *Green*, 268 B.R. at 648.

At trial, though, Hansen blamed his lawyer for his failure to amend. According to Hansen, his lawyer advised him that a case called "Bailey" made it irrelevant whether he ever fixed his mistakes.

If Hansen was telling the truth when he said this and did not simply concoct the answer for trial, his lawyer gave him bad advice. The decision to which Hansen was likely referring, *Bensenville Cmty. Ctr. Union v. Bailey (In re Bailey)*, 147 B.R. 157 (Bankr.N.D.Ill.1992), does say that an amendment to schedules "cannot expunge the falsity of an oath." *Id.* at 165. But it also says that "subsequent disclosures are evidence of innocent intent." *Id.* In this respect, the decision is consistent with other decisions here and elsewhere. *See, e.g., Structured Asset Servs. L.L.C. v. Self (In re Self)*, 325 B.R. 224, 249 n. 6 (Bankr.N.D.Ill.2005) (making this distinction); *Olbur*, 314 B.R. at 746; *Ardisson*, 272 B.R. at 359; *Green*, 268 B.R. at 648; *Economy Brick Sales, Inc. v. Gonday (In re Gonday)*, 27 B.R. 428, 432–33 (Bankr.M.D.La.1983); *Aetna Ins. Co. v. Nazarian (In re Nazarian)*, 18 B.R. 143, 147 (Bankr.D.Md.1982). Hansen would have done better to amend his filings and correct his mistakes.[10]

ords Schechter had been "abusing [him] for a year." (Dep. Tr. at 37). What Hansen took for "abuse," of course, was Schechter's performance of his statutory duties as trustee. *See* 11 U.S.C. § 704.

9. Hansen's other explanations are equally unconvincing. He claimed that he listed the Harris CD as an asset in order to notify the trustee that the trustee might have some form of avoidance action; that he did not remember owning the Nextel stock (although he was happy three months earlier to represent to an Illinois court that he owned it); and that he somehow "missed" the question about prior addresses. None of these explanations is remotely plausible. Hansen also said that he failed to list the oriental rugs because he concluded they were "worthless," and that he left off dividends and interest he received because they were so minimal he did not consider them income. These were not decisions Hansen had a right to make. "Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate." *Yonikus*, 974 F.2d 901 at 904; *see also Costello*, 299 B.R. at 899 (noting that "[i]t is not the debtor's responsibility to decide which assets are to be disclosed to creditors").

10. That Hansen acted on legal advice—if indeed he did—also is not a valid excuse for the many falsehoods in his schedules and SOFA. Hansen signed the schedules and SOFA, attesting to the truth of their contents. He is responsible for their inaccuracy, not his lawyer. *See Lewis v. Summers (In re Summers)*, 320 B.R. 630, 642 (Bankr.E.D.Mich.2005) (refusing to accept "a debtor's abdication of responsibility to an attorney when filling out the schedule[s] and statement of financial affairs"); *Olbur*, 314 B.R. at 746–47 (noting that when a debtor has attested to the truth of

Hansen insisted, finally, that his heart was pure. He denied intending to defraud anyone, noting that he had nothing to gain from filing fraudulent papers with the court.

█ But Hansen's unamended, error-filled schedules and SOFA tell a different story, one rather more reliable than his self-serving protestations of innocence. *Costello,* 299 B.R. at 895 (noting the reluctance of courts to "accept a debtor's own self-serving statement of his intent as the best evidence of that intent") (internal quotation omitted). Given the staggering number of errors and omissions, furthermore, the question of whether Hansen stood to gain anything from them has little relevance. *See Office of U.S. Trustee v. Zimmerman (In re Zimmerman),* 320 B.R. 800, 811 (Bankr.M.D.Pa.2005). Bankruptcy is a "give-and-take process," and for debtors to receive the benefits of the Code they must make "complete disclosure to their creditors and the Trustee." *Id.* (internal quotation omitted). Hansen did not keep up his end of the deal.

Because Hansen knowingly and fraudulently made a false oath in connection with his bankruptcy, judgment will be entered in Schechter's favor on the section 727(a)(4)(A) claim.

### b. Section 727(a)(3)

█ Schechter is also entitled to judgment on his claim that Hansen's discharge is barred under section 727(a)(3).

Section 727(a)(3) denies a discharge to a debtor who has "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records and papers, from which the debtor's financial condition or business transactions might be ascer-

tained, unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3). The provision ensures that debtors will provide "enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Union Planters Bank, N.A. v. Connors,* 283 F.3d 896, 899 (7th Cir. 2002) (internal quotation omitted).

█ Debtors accordingly have an obligation to maintain, preserve, and produce records of their financial affairs. *Id.; Brandt v. Carlson (In re Carlson),* 231 B.R. 640, 654 (Bankr.N.D.Ill.1999). Records need not be kept in any particular manner, nor does the Code impose "any rigid standard of perfection in record-keeping." *Juzwiak,* 89 F.3d at 428. The records must, however, be sufficient to give "a true presentation of the debtor's financial affairs." *Scott,* 172 F.3d at 969 (internal quotation omitted). Neither the trustee nor the court has an obligation to "reconstruct a debtor's financial situation" by combing through disorganized piles of paper. *Union Planters Bank,* 283 F.3d at 900; *see also Juzwiak,* 89 F.3d at 429. Nor are the trustee and court required, in the absence of adequate records, to take a debtor's word for his financial dealings. *Juzwiak,* 89 F.3d at 429–30; *Self,* 325 B.R. at 240–41; *Carlson,* 231 B.R. at 655.

█ The party alleging a violation of section 727(a)(3) has the initial burden of demonstrating the inadequacy of the debtor's records. *Self,* 325 B.R. at 241–42; *Costello,* 299 B.R. at 897; *Community Bank of Homewood–Flossmoor v. Bailey (In re Bailey),* 145 B.R. 919, 924 (Bankr. N.D.Ill.1992). Adequacy or its absence is

his petition and schedules, "the debtor—not his lawyer—is accountable for any errors and omissions"); *Bostrom,* 286 B.R. at 363. This

is especially so given that Hansen is a sophisticated debtor and a lawyer himself. *See Ardisson,* 272 B.R. at 359.

a case-by-case determination. *Self,* 325 B.R. at 241–42; *Costello,* 299 B.R. at 897. Relevant factors include the size, complexity and nature of the debtor's business; his level of education and sophistication; his business experience and acumen; and his "personal financial structure." *Id.* The question of adequacy, ultimately, is one of "quality, not quantity." *Bailey,* 145 B.R. at 924. Records are adequate if they "permit the court and creditors to trace the debtor's financial dealings." *Senese,* 245 B.R. at 576.

Schechter readily met his burden of proving Hansen's records inadequate. Hansen's income tax records for 2000 and 2001 were incomplete, the former lacking a W–2, the latter missing a Schedule B. Hansen had no copy of either the Harris CD or the promissory note to his mother. More important, Hansen did not produce the monthly statements from his Fidelity account, the checks written on the account, or a ledger or other record of those checks, all of which were necessary to explain the flow of funds in and out of the account. Most damning of all, perhaps, Hansen came up with virtually no checks or statements from his account at Harris Bank—just four statements and just thirty-one checks—for August 2001 through the end of September 2002, roughly the year preceding the bankruptcy.

The records Hansen lacked are the kind every adult is expected to keep and preserve: tax returns, promissory notes, checks, check ledgers, bank statements, statements from investment accounts. *See Ochs v. Nemes (In re Nemes),* 323 B.R. 316, 325 (Bankr.E.D.N.Y.2005) (noting that bank statements and the like "form the core" of what is necessary to ascertain the debtor's financial condition, "primarily his use of cash assets") (internal quotation omitted). Even if Hansen had been someone of more modest education and back-ground, then, his records would have been inadequate. For a lawyer and corporate officer, someone with considerable financial sophistication and experience, these records were abysmal.

■ Once Schechter established the inadequacy of Hansen's records, Hansen had the burden of showing that his failure to keep or preserve records was "justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3). In this, Hansen fell well short. He offered no explanation for the sketchy tax returns, the missing promissory note, or the incomplete checking account records, stating only that he had produced all the checks and statements he had. (Tr. at 44–45, 100–101). He defended the missing Fidelity checks on the ground that Fidelity does not return canceled checks (*Id.* at 38), but he never said why he failed to keep copies of the checks in the first place or why he maintained no ledger for the account. He claimed, finally, that the monthly Fidelity statements were ruined in basement floods. Even if this story were believable, however, Hansen conceded that he could have secured duplicate statements but decided not to. (*Id.* at 31). Hansen failed to justify the inadequacy of his records. *Cf. Self,* 325 B.R. at 244–45 (deeming insufficient debtor's claims that he had "produced all of the bank statements that he was able to find" and other records were "damaged in a flooded basement").

■ Section 727(a)(3) is not designed to bar the discharge of an ordinary consumer debtor. *Scott,* 172 F.3d at 970; *Petersen,* 296 B.R. at 789. In most cases, then, holes in a consumer debtor's financial records will not be enough to invoke section 727(a)(3). Where, however, there has been a " 'sudden and large dissipation of assets,' " the absence of records will warrant the denial of the debtor's discharge. *Self,* 325 B.R. at 240–41 (quoting *PNC*

*Bank, N.A. v. Buzzelli (In re Buzzelli)*, 246 B.R. 75, 98 (Bankr.W.D.Pa.2000)). Here, Hansen took the $270,469 he received from the sale of the Gavin Court property and over the next year lost all of it in ways that cannot be traced accurately, if at all, from the sparse financial records he supplied to the trustee. Hansen is hardly the ordinary consumer debtor in any event.

Because Hansen unjustifiably failed to keep and preserve records from which his financial condition and transactions might be ascertained, Schechter is entitled to judgment on his section 727(a)(3) claim.

### c. Section 727(a)(5)

■ Given the outcome on the section 727(a)(3) claim, it is no surprise that Schechter is entitled to judgment on his section 727(a)(5) claim as well. *See First Commercial Fin. Group, Inc. v. Hermanson (In re Hermanson)*, 273 B.R. 538, 553 n. 15 (Bankr.N.D.Ill.2002) (observing that claims under sections 727(a)(3) and (5) are "in many ways inextricably linked").

■ Section 727(a)(5) bars a discharge when "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). By penalizing a debtor who is insufficiently forthcoming about what happened to his assets, this section is another designed to "relieve[ ] creditors and courts of the full burden of reconstructing the debtor's financial history and condition, placing it instead upon the debtor." *Hermanson*, 273 B.R. at 545. Under section 727(a)(5), the bankruptcy court has "broad power to decline to grant a discharge . . . where the debtor does not adequately explain a shortage, loss, or disappearance of assets."

*In re D'Agnese*, 86 F.3d 732, 734 (7th Cir.1996) (internal quotation omitted).

■ Proof under section 727(a)(5) comes in two stages. *First Federated Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 887 (7th Cir.1983). Although the objecting party always has the burden of proof, *id.*, that party meets its initial burden of going forward by showing that the debtor "at one time owned substantial and identifiable assets that are no longer available to his creditors," *Bostrom*, 286 B.R. at 364; *see also Martin*, 698 F.2d at 887; *Hermanson*, 273 B.R. at 545. If this showing is made, the burden then shifts to the debtor to offer a "satisfactory explanation" for the unavailability of those assets. *Hermanson*, 273 B.R. at 545 (internal quotation omitted); *see also Martin*, 698 F.2d at 887; *Bostrom*, 286 B.R. at 364.

■ What explanation will be "satisfactory" rests with the court's discretion.[11] *Costello*, 299 B.R. at 901; *Bostrom*, 286 B.R. at 364. The debtor's account need not be "far-reaching and comprehensive," but it must be more than a "vague, indefinite, and uncorroborated hodgepodge of financial transactions." *Costello*, 299 B.R. at 901 (internal quotation omitted). Nor does the debtor need to justify "the wisdom of the . . . disposition of assets." *Hermanson*, 273 B.R. at 545; *see also Richardson v. Von Behren (In re Von Behren)*, 314 B.R. 169, 181 (Bankr.C.D.Ill. 2004) (finding it irrelevant whether debtor's spending was "on illegal, immoral, or otherwise imprudent activities"). What matters is the "completeness and truth" of the explanation. *Costello*, 299 B.R. at 901. The debtor must explain—credibly and in good faith—"what really happened to the

---

11. Or as the court in *Green* put it, no irony apparently intended: "A satisfactory explana- tion is one that convinces the judge." *Green*, 268 B.R. at 649.

assets in question." *Bailey,* 145 B.R. at 925 (internal quotation omitted).

As he did on the section 727(a)(3) claim, Schechter met his burden of going forward. There was no dispute that Hansen sold his house on Gavin Court in June 2001 and deposited the entire $270,469 he netted from the sale into his Fidelity account. There was also no dispute that by December 31, 2002, almost all of the money was gone: the Fidelity account had a balance of only $291. A loss of more than a quarter of a million dollars in the year preceding a bankruptcy filing could fairly be described as a loss of "substantial and identifiable assets," *Bostrom,* 286 B.R. at 364, calling for a satisfactory explanation from the debtor. The burden accordingly shifted to Hansen to give one.

He did not. Hansen asserted, first, that he had lost a total of $325,000 trading technology stocks. The year-end Fidelity account statements and tax statements he provided, however, do not contain that number, and Hansen was never able to give a cogent explanation of where it came from. The statements do reflect losses. They also contain numbers that, if added together, produce a figure in the vicinity of $325,000. But Hansen did not explain why he added those numbers and not others. (Hansen's $325,000 figure also tended to vary depending on when he was asked about it.) As Schechter rightly remarked, the Fidelity statements standing alone are incomprehensible. (*See* Tr. at 60). Rendering them comprehensible was Hansen's job, not the job of the trustee or the court. *See Scott,* 172 F.3d at 969–70; *Juzwiak,* 89 F.3d at 429.

Just as Hansen's records fail to explain satisfactorily his stock market losses, they do not explain what he claimed were his withdrawals of roughly $100,000 in 2001 and again in 2002. Hansen said that near the end of 2001 he withdrew $100,000 from the Fidelity account to lend to APMC. The 2001 statement shows total withdrawals of $102,403 (not $100,000), but nothing in the statements indicates where that money went or how it arrived there. Hansen testified that the funds had been wired from the Fidelity account to his account at Harris Bank, but he produced no record of a wire transfer. So although he produced two Harris checks from December 2001 totaling $100,000 payable to 5841 Building Corporation, apparently the checks intended for APMC, he offered no documentary link between the Fidelity account and those checks.[12]

Hansen claimed that the $100,262 (not $100,000) withdrawn in 2002, meanwhile, was used for "living expenses." But Hansen was unable to corroborate this assertion because he failed to come forward with checks from the Fidelity account, a check ledger for the account, records of any wire transfers from the account ($30,650 of the $100,262 consisted of wire transfers), or the vast majority of the checks and statements from his Harris account (the account to which the funds were presumably transferred). Without these records, it is impossible to verify Hansen's vague claim that in 2002 $100,000 vanished down his "living expense" drain. His explanation was not satisfactory.[13] *Cf. D'Agnese,* 86 F.3d at 734 (affirming denial of discharge where

---

**12.** Further clouding the question of what happened to the $100,000 withdrawn from the Fidelity account in 2001:(1) the 2001 annual statement shows only $25,000 in "other withdrawals" (i.e., wire transfers), not $100,000 as Hansen claimed; (2) the statement lists $70,403 in "checking activity" that has never

been explained; and (3) Hansen produced a third 2001 Harris check payable to 5841 Building Corporation (*see* D. Ex. 13), this one for $100,000, the origin and purpose of which remain a mystery.

**13.** Notwithstanding bankruptcy court decisions suggesting otherwise, *see, e.g., Costello,*

debtor gave only "a vague and indefinite statement about the missing assets"); *Green*, 268 B.R. at 650 (denying discharge where debtors offered "only vague, indefinite, incomplete explanations" for their losses).

Because Hansen failed to explain satisfactorily a loss of assets to meet his liabilities, Schechter is entitled to judgment on the section 727(a)(5) claim.

### 4. Conclusion

Judgment is entered in favor of plaintiff Joel A. Schechter and against defendant Chris Hansen on the claims in the complaint under 11 U.S.C. §§ 727(a)(4)(A), 727(a)(3) and 727(a)(5). The claim under 11 U.S.C. § 727(a)(4)(D) is dismissed as moot. Debtor Chris Hansen is denied a discharge. A separate Rule 9021 judgment will be entered consistent with this opinion.

299 B.R. at 901; *Hermanson*, 273 B.R. at 545–46, a debtor's explanation for the loss of assets can be satisfactory even without records corroborating the loss. *See Strzesynski v. Devaul (In re Devaul)*, 318 B.R. 824, 840 (Bankr.N.D.Ohio 2004) (noting that section 727(a)(5) itself says nothing about written corroboration and declining to hold "that an explanation must always be supported by records to be satisfactory"); *see, e.g., Olbur*, 314

B.R. at 741–42 (deeming sufficient debtor's credible testimony about loss of contents of safe deposit box). The absence of records is always relevant, though, to the credibility of the explanation. *Devaul*, 318 B.R. at 840. With only the cryptic Fidelity statements for support, Hansen's tangled, confused, and contradictory explanation of what happened to the $270,469 was not credible.